MAT CALDWELL v. THE STATE.

1. INDICTMENT.—All questions relating to the form of the indictment which do not affect the substance of the charge must be made before the defendant applies to change the venue of the cause.

2. INDICTMENT.—A motion in arrest of judgment, based on the fact that it did not appear by the record that the indictment was returned into court by the grand jury, will not be entertained when the indictment had been substituted without objection for one that had been burned, and the objection was raised for the first time after change of venue and trial.

3. NEW TRIAL.—The omission of the court to have the defendant arraigned before change of venue constitutes no ground for new trial.

4. CONSCIENTIOUS SCRUPLES.—The constitutional provision (art. 5, § 8) which gives a jury discretion in capital felonies to substitute imprisonment for life for the death penalty, does not abrogate the law which makes conscientious scruples about inflicting the punishment of death for crime a disqualification in a juror.

5. JUROR—MENTAL DEFECT.—"Mental defect," as the term is used in the Code of Procedure, (Paschal's Dig., art 3040,) must be understood to embrace either such imbecility or such gross ignorance as practically disqualifies a person from performing his duties as a juror. The fact that the Constitution has made colored persons qualified

jurors, secures them no exemption from the operation of the neces-
sary rule that a mental defect disqualifies a juror.

6. OFFICER—MURDER.—When an officer charged with the custody of
a prisoner kills him while attempting an escape, when the life of the
officer is neither endangered nor his person threatened, and he com-
mits the homicide, not with express malice, but from a desire to
prevent the escape of the prisoner, the offense is murder in the
second degree.

APPEAL from Falls. Tried below before the Hon. J. H.
Banton.

Late Saturday evening, in the month of June, 1869, a
stranger, who gave his name as Lackey, obtained from S.
M. Jones, of Limestone county, a warrant for the arrest
of one Gilmore, who was charged by him with stealing
two mules. Jones, according to his own testimony, was
"acting justice of the peace." On the following Sabbath
morning, at sunrise, the defendant, Mat Caldwell, who was
constable of this beat, appeared at the residence of Wil-
liam Cleveland, in company with Lackey and one Allen
Norris, and inquired for Gilmore. They were informed
by Mr. Cleveland that Gilmore was his tenant and lived
with his wife near by. Caldwell, after announcing his
purpose to arrest Gilmore, was invited, with his compan-
ions, to remain for breakfast, and was told by Cleveland
that if they would remain he would go alone and arrest
Gilmore. Whether this proposition was influenced by a
suspicion that Gilmore's life was in danger, does not ap-
pear. The proposition was declined by Lackey, who
stated that Gilmore was a bad man who had before es-
caped. Cleveland then accompanied the party to Gil-
more's house, leaving Lackey concealed some two hundred
yards from the house. Gilmore came out of his house when
called by Cleveland, and was then arrested by Caldwell
without resistance, being told by Cleveland that Caldwell
was deputy sheriff and would treat him like a gentleman.
Gilmore, who came out barefooted and bareheaded, de-
sired to return for his shoes, which were brought to him.

Caldwell told him that he had heard he was in the habit of getting away from officers; that he would be protected and treated properly, but if he attempted to get away he would be hurt. The party then started with the prisoner to Cleveland's house, and was joined by Lackey when they reached the place where he had remained concealed in a ravine. Lackey, after asking the prisoner if he recognized him, with pistol in hand, began to curse and abuse him, and told him that he had escaped from him several times but would not do so again. Here Caldwell interfered and stopped the abuse, announcing that Gilmore was his prisoner and he would protect him, but telling Gilmore that if he attempted to escape he would shoot him. When the party had entered through the outer gate of Cleveland's premises, some two hundred yards from his house, and were approaching the yard gate, they were met by Dr. Griffin, who objected to their going to the house with the prisoner, on account of the delicate health of Mrs. Cleveland. They then dismounted and turned in the direction of a school-house near the yard and to the right of Cleveland's house, with the avowed purpose of eating their breakfast at that place. Caldwell took charge of the horses, while Lackey and Norris started with the prisoner to the school-house, under instructions from Caldwell to shoot him if he ran from them. This instruction was given in response to a remark from Norris, who expressed his belief that the prisoner would run. As they approached the school-house the prisoner ran rapidly to some tall weeds, higher than one's head, in the rear of the school-house near a fence. Beyond the fence grew cotton higher than one's head, and still beyond that corn in tassel. As the prisoner crossed the fence, Lackey fired, and one of the witnesses thought the shot broke the prisoner's arm. After crossing the fence, Gilmore turned to the left, instead of seeking cover in the cotton and weeds, and ran rapidly to Cleveland's house, Lackey pur-

suing and firing at his back.   Caldwell took position near
the yard gate, and as Gilmore approached the door of the
house, with his left side exposed, Caldwell fired at him
twice, as stated by one of the witnesses, who saw the lint
fly from his left side and blood flow from the wound.
Gilmore sunk at the fire of the pistol, but continued to
run, and entered the house pursued by Lackey.   Several
shots were fired in or beyond the house after they disap-
peared from sight.   When Gilmore was next seen he was
lying on a bed in Cleveland's kitchen, with four pistol
wounds on his person, one of which was in his left side.
His left arm was broken, and two balls had entered his
back.   He died from the wounds that day.   None of the
witnesses seem to have known Lackey, who disappeared
after the killing.   The only evidence of Gilmore's charac-
ter was given by Tucker, who stated that it was "bad for
breaking arrests."

The wife of the murdered man remained, nursing him
until his death.   When told by the physician, Dr. Griffin,
that he must die, Gilmore protested his innocence of the
charge for which he was arrested, whereupon the doctor
exhibited his sympathy for the murdered man by saying,
in the presence of his wife, "Hush, Gilmore; don't die
with a lie on your lips."   Dr. Griffin heard the conver-
sation between the dying man and his wife, who urged
him to repent, and testified that Gilmore said to his wife,
"Be careful, Mary, what you say."   The witness, Jones,
was permitted to testify to all the conversation of Lackey
when he applied for the warrant, tending to show that Gil-
more had stolen his mules.   If any objection was made to
this testimony by the District Attorney the record does
not disclose it.

A bill of indictment against Caldwell was ignored by the
first grand jury organized after the homicide.   The sheriff
(Tucker) was permitted to testify that the County Court
of Limestone county passed a resolution (in 1869) compli-

Opinion of the court.

menting Caldwell over his action in the premises. The records and papers of the district clerk's office were destroyed by fire in the fall of 1873, and the District Attorney was permitted to substitute an indictment against Caldwell, on the back of which he endorsed that it was " substantially the same as the original, which was lost by fire."

At the February term, 1874, the venue was changed on Caldwell's application to Falls county. His arraignment was omitted prior to the change of venue, and no objection was made by his counsel to the indictment until the venue was changed.

Nine jurors disqualified themselves by swearing that they had conscientious scruples about inflicting the death penalty for crime, and were excused from serving on the jury, which was excepted to by Caldwell's counsel, and the action of the court overruling the exception assigned for error.

A colored juror was called, who, being examined, stated that he did not understand the obligations of an oath. After an ineffectual effort on the part of the court to educate him on the subject, "he still answered that he did not understand either," and was excused from serving as a juror on account of mental defect. Exception was also taken to this, and the action of the court assigned for error.

Verdict of guilty, and punishment assessed at five years in the penitentiary. Motions for new trial and in arrest of judgment overruled. Their character will be understood from the opinion.

*Herring & Anderson*, for appellant.

*George Clark, Attorney General*, for the State.

ROBERTS, CHIEF JUSTICE.—The defendant was indicted in the county of Limestone for the murder of one Gilmore on the 16th day of June, A. D. 1868. At his instance, supported by the oath of four persons, the venue was changed

to Falls county, where he was tried and convicted of murder in the second degree, and his punishment was assessed by the jury at five years' labor in the penitentiary. Motions for new trial and in arrest of judgment were made, which, being overruled by the court, judgment was rendered in accordance with the verdict of the jury, and defendant gave notice of and obtained an appeal to this court.

Those motions and the bills of exceptions taken at the trial raise numerous questions. It was objected in the motion in arrest of judgment that it did not appear by the record that the indictment was returned into court by the grand jury. It appears that the indictment on which he was tried was substituted in the District Court of Limestone county before the change of venue in lieu of the original, that had been destroyed by fire. The indictment was substituted without any contest as to its validity as a record of that court, and it purports to be a copy of the original, regularly filed in the court by the clerk thereof on the 11th day of June, 1873. The venue was changed at the February term, 1874, after the substitution of the indictment. The orders of the District Court of Limestone county, as contained in the transcript sent and certified to by the district clerk of Limestone county to the District Court of Falls county, did not go further back than those at the October term, 1873, subsequent to the date of the filing of the indictment, from which it is probable that the records containing them had also been burned. Had there been any doubt about the authenticity of the substitute as a valid indictment, the original of which had been properly returned into court, it would have been appropriately called in question by the defendant before the change of venue. Then the court would have had ample opportunity of ascertaining the authenticity of its own records, and, if necessary, of supplying the loss of any order that might be necessary to make a complete record of all the proceedings in this case from its inception. The defendant continually

recognized it as a pending charge against him from the time of its substitution until his trial and conviction in Falls county at the March term, 1874.

This indictment shows on its face, as required by our code, that it was presented in a court having jurisdiction of the offense set forth. (Pas. Dig., art. 2863.) Had it not done so, it would have been subject to an exception to the form thereof. (Pas. Dig., art. 2955.) Being thus established as an authentic indictment, and not being objected to upon that ground of exception permitted by the code, and no such question having been raised until after the change of venue and the trial of the case upon the record as it stood removed to Falls county at his own instance, the objection when made was properly overruled. This will be made more obvious when the next objection is considered, which is, that the defendant was not arraigned in Limestone county before the change of venue. He was arraigned on the trial in Falls county. The Code of Criminal Procedure provides that "the venue shall not in any case be changed on the written application of the defendant until after all motions, special pleas, and exceptions have been filed and acted on by the court, and if overruled, the plea of not guilty entered." (Pas. Dig., art. 2997.) This shows that it is contemplated that all questions relating to the form of the indictment, and those not relating to the substance of the charge which the defendant may desire to make, must be made by him before he makes his application for a change of venue, and that all that is left to be done thereafter in the court to which the case is removed is to try the issue joined upon a plea of not guilty, and pronounce judgment thereon according to law.

It is contended that the conviction is erroneous, because of the neglect or omission of the court to have the defendant arraigned before the change of venue, as required by the statute. There is no express provision of law that makes this error of itself a ground of reversal of a judg-

ment of conviction, so as to give the defendant a new trial. The code provides that "new trials in cases of felony shall be granted for the following causes and no other." (The first need not be quoted.) "2. Where the court has misdirected the jury as to the law, or has committed any other material error calculated to injure the rights of the defendant." (Pas. Dig., part of art. 3137.) It is not perceived what possible injury to the defendant could have been produced by this omission or error of the court. It was, therefore, no ground for a new trial, and it can surely not be contended that it would have been a good ground for arresting the judgment and discharging the prisoner. This objection was properly overruled.

An exception was taken on the trial to the ruling of the court in excluding from the jury certain persons, who, being questioned as to their qualifications according to the terms of the statute, answered, "that they had conscientious scruples concerning the infliction of death for crime." It is contended that the provision in the Constitution which gives the jury the discretion, in cases of capital felonies, of substituting imprisonment for life for the penalty of death, abrogates the law which makes such conscientious scruples a disqualification in a juror. The force of the objection is not perceived, and cannot be recognized so long as by law the enormity of some offenses deserves to be requited with the punishment of death.

Another exception was taken to the ruling of the court in excluding from the jury a certain person who stated, after explanation by the presiding judge, that he could understand neither the questions put to him to test his qualifications as a juror nor the obligations of an oath. One of the principal causes of challenge that may be made to a juror is, "that he is insane, or has such a defect in the organs of seeing, feeling, or hearing, or such bodily or mental defect or disease, as renders him unfit for jury service." (Pas. Dig., art. 3040.)

"The court is to judge, after proper examination, of the qualifications of a juror." (Pas. Dig., art. 3044.)

Mental defect must be understood to embrace either such imbecility or such gross ignorance as practically disqualifies any person from performing his duties as a juror; and if his mind is so weak that he cannot be made to understand the obligations of an oath nor religious scruples, surely his "mental defect" is sufficient to disqualify him as a juror. To impose such a person as a juror on a prisoner who desired a fair trial might be a positive injury as well as an injustice to the State. It appears that the person thus excluded was a "colored" person. It is argued that, as the Constitution makes colored persons qualified jurors, the court erred in making his mental defect a ground of disqualification. That does not follow. The same imbecility or defect of intellectual capacity would disqualify any person.

We cannot say that the court, having the power under the law to determine the fact, committed an error in adopting that mode of ascertaining it, or that his conclusion was erroneous after having done so. We cannot think that the law either requires or could tolerate the practice of swearing a man as a juror who could not be made to understand the obligations of an oath.

The facts of the case are, in substance, that Gilmore was a stranger, who had been living with his family as a renter on the farm of William Cleveland, in Limestone county, about six months. He was arrested on the morning of the 16th of June, 1868, by defendant, under a warrant for stealing two mules, the property of Lackey, also a stranger, who represented himself as a resident of Grayson county, where the mules were charged to have been stolen. Defendant was deputy sheriff and constable of the beat, and had with him, to aid him in making the arrest, and summoned for that purpose, said Lackey, Allen, Norris, and William Cleveland. Gilmore was called out of his

house, just after sun-up, in his shirt sleeves, barefooted, bareheaded, and unarmed, and arrested by defendant. His hat and shoes were procured for him, and he was taken a half a mile to the residence of William Cleveland, where the party were invited to take breakfast. Dr. Griffin being there, requested that he should not be carried to the dwelling-house, on account of the sickness of Mrs. Cleveland, but to a school-house near the dwelling-house. The defendant, Lackey, and Norris, all had six-shooters. Lackey had represented that Gilmore was in the habit of escaping from officers.

Norris, upon starting with Gilmore to the school-house, told defendant that he believed that Gilmore was going to run, and requested defendant to go along with him and Lackey. Defendant replied that he would attend to the horses, and for him and Lackey to carry Gilmore to the school-house, and that if he ran, to shoot him. As Lackey and Norris approached the school-house with Gilmore, he broke from them, ran around the house into high weeds, with Lackey after him. Lackey shot him in the arm as he got over the fence. Gilmore then, instead of running off through the tall corn and cotton in the field in front of him, turned his course directly through an open space towards the dwelling-house, Lackey following and shooting at him as he ran three or four times. Norris, being on his left side, shot at him as he ran three times, and when he had reached within a few steps of the dwelling-house the defendant, being also on his left side, called to him in a loud voice to "halt," and shot at him twice. At his second shot the 'lint or dust was seen to fly from Gilmore's left side, the blood to come from the wound, and he seemed to sink and turn his course somewhat. He went on through the house, Lackey following him, and shot at him again. He was immediately found on a bed in the kitchen with four wounds, one in the arm, two in the back, and one in the side, the three last of which were pronounced

by Dr. Griffin to be mortal, if they went directly in the body, which he could not positively say, as he did not probe them. He died from these wounds about three o'clock that day.

There was an effort on the part of the defense to raise a presumption that the defendant shot the prisoner under the apprehension that he was endeavoring to reach the dwelling-house to get the guns that were known by the prisoner to be there, for the purpose of killing the defendant or his *posse*, and to make his escape by the use of violence towards them with said arms. This was the main defense upon the merits sought to be made, both upon the facts elicited and upon the law, as asked by defendant's counsel to be charged to the jury. A complete answer to this was that it was not shown, or even attempted to be shown, that the defendant, or Lackey, or Norris knew anything about there being guns at the dwelling-house, and the whole conduct of Gilmore and of the other parties who shot at him, with all the attendant circumstances, render such a supposition wholly improbable.

Another ground of defense was sought to be made by raising a doubt as to Gilmore being killed by defendant's shot, inasmuch as Dr. Griffin did not probe the wounds, and did not say that the one in his side went directly into his body. The sudden appearance of the blood where he was shot in the side, and his suddenly sinking from the shot of defendant, practically helped out the surgical examination of Dr. Griffin, and rendered it quite unnecessary that he should have probed that wound to have convinced the jury that it was mortal. But apart from all that, the defendant had told the guard to shoot him if he ran. Immediately afterwards he did run. They, obeying his orders, shot him, and he, being present, shot him also, and by the shots he was killed. What matters it whether one or all of the shots killed him? It was done by the order of and aided in by the defendant, he being present.

"Any person who advises or agrees to the commission of an offense, and who is present when the same is committed, is a principal thereto, whether he aids or not in the illegal act." (Pas. Dig., art. 1813.)

The evidence in the case, when thoroughly sifted down, exhibits a plain case of the killing of a prisoner by the officer and his guard while he was unarmed, and not resisting or attacking them, but simply running away to make his escape from their custody.

The charge of the court was full and perspicuous upon all points in the case, and fairly presented the law applicable thereto. Upon the leading point it instructed the jury substantially as required by the code, which reads as follows: "The officer or other person executing an order of arrest is required to use such force as may be necessary to prevent an escape, but he shall not in any case kill one who attempts to escape, unless in making or attempting such escape the life of the officer is endangered or he is threatened with great bodily injury." (Pas. Dig., art. 2215.)

A part of the charge given was in these words: "If you believe from the evidence, beyond a reasonable doubt, that the defendant is guilty of the homicide, but that he was not prompted thereto by express malice, but by a desire to prevent the escape of the deceased, and that he was not justified in the killing on account of being violently resisted, putting him or his *posse* in fear of loss of life or great bodily injury, you will find the defendant guilty of murder in the second degree."

This was exactly the proper charge required by the evidence in the case, and the court properly refused any and every charge which presented the law in a different phase. The jury, from their finding, appreciated its force, and properly acted upon and in accordance with it in finding their verdict, which, from the facts in proof, they were constrained to do.

The law places too high an estimate upon a man's life, though he be a poor, friendless prisoner, to permit an officer to kill him, while unresisting, simply to prevent an escape.   It has been vindicated in this case.

There being no error in the judgment of the court, it is affirmed.

AFFIRMED.