## GEORGE LESTER *v.* THE STATE.

1. JURORS—QUALIFICATIONS.—The freehold or household and other qualifications of jurors required by the 1st section of the jury act of 1876 are not dispensable by the courts. The cases of *Brennan* v. *The State*, 33 Texas, 266, and *Maloy* v. *The State*, 33 Texas, 599, so far as they intimate otherwise, are overruled.

2. SAME—PRACTICE.—But objections to a juror for want of such qualifications should be urged when the jury is impaneled; or, if the objection was not then known, and was primarily raised in a motion for a new trial, the motion must be supported by affidavit rebutting the laches.

3. SAME.—The judgment entry in this case recited that the jurors, naming them, were "duly tried, impaneled, and sworn," but the motion for a new trial alleged that one of said jurors acted as such "without having been tested as to whether he was a freeholder of the state, or a householder of the county." *Held*, that the recital in the judgment controverts and overrides the allegation in the motion; and that the objection, if true, should have been taken when the jury was impaneled.

4. SAME.—In a capital case the omission of the court below to test the jurors as to their qualifications, required by section 1 of the jury act of 1876, would, if properly taken advantage of, be error.

5. CAUSES OF CHALLENGE.—Though section 26 of the jury act of 1876 enumerates a number of causes for the challenge of a juror, they are not the only causes which may be assigned and sustained.

6. BIAS OF JUROR—PRACTICE.—In the trial of a white man for the murder of a negro, the court below, despite objection by the accused, allowed the state's attorney to ask the petit jurors, on their *voir dire*, "if they could, upon the same evidence, return the same verdict against a white man for killing a negro as for killing another white man." *Held*, that the question was a proper one for the purpose of enabling the court to satisfy itself that the jurors were free from a disqualifying bias or prejudice.

7. ARGUMENTS based upon partisan feelings, and appeals grounded upon considerations of race, color, or previous condition, elicit from this court its severest condemnation. The law of this state recognizes no difference between the murder of a negro and the murder of a white man.

8. "HOUSEHOLDER."—A juror swore that he was a single man, and not a freeholder, but that he rented a house and land, and, with a younger brother, occupied the house as a home for all purposes except that he took his meals with the owner of the premises. *Held*, that the juror was a *householder* within the meaning of the jury act.

9. MURDER—CHARGE OF THE COURT IN A CASE OF MUTUAL CONFLICT.—When death ensued from a mutual conflict, brought on by the accused, whose guilt, or the degree of it, depended on the controverted question of his intent at the time, the court below, in its instructions to the jury, should not have stopped at charging the law applicable to the hypothesis that the accused brought on the conflict with an intent to kill. The omission to charge upon the contrary hypothesis was calculated to prejudice the accused in the minds of the jury.

APPEAL from the District Court of Milam. Tried below before the Hon. S. FORD.

The indictment charged the appellant with the murder of Woods McLellan, on September 16, 1876.

The deceased was a negro, and lived in a cabin on the farm of the accused. Two days previous to his death he swore out warrants for the arrest of the accused for unlawfully carrying a pistol, and for an assault upon one R. J. Houston; and on these warrants the accused was taken in custody at Cameron, in Milam county, on September, 16, 1876, but was released on bail. That night he shot and killed the negro at his cabin.

S. M. Kimble, a witness for the state, testified that he was a deputy sheriff, and had the accused in his custody for a short time on September 16, 1876; that accused told him

28

that the deceased had reported him and caused his arrest, and that, when he gave bond and went home, he intended "to raise hell with Woods; that no d—d negro should live on his place and swear d—d lies against him."

Horace Resley was the only witness who was present at the killing. Testifying for the state, his account of the matter was substantially as follows:

On the morning of September 16, 1876, the accused came to the house of witness' father, about three miles from the town of Cameron. He had a double-barreled shot-gun, and asked witness to go hunting with him. As they started off, the deceased was present in the yard, and the accused gave to the deceased a pistol and told him to take it home and give it to Mrs. Lester.

After leaving, the accused and witness concluded to go to Cameron, and on reaching there the accused left his gun in a saloon, and afterwards was arrested by the town constable by virtue of two warrants which had been issued on the complaint of the deceased. Accused was released on bail, and he and the witness appear to have knocked about the town for the balance of the day, taking an occasional drink. The accused made no threat against the deceased, so far as witness heard. Between nine and ten o'clock at night they left town on their return home. After going part of the way, the accused said that the stock had been breaking in and destroying his crop, and asked witness to go by with him to see if any stock were in his field. When they came to the place of the accused, they rode into the field and past the north end of the cabin of the deceased, stopping about fifteen steps in front of its north-east corner. Accused called the deceased three times, and, receiving no answer, he dismounted and walked past the front of the cabin, nearly to the south-east corner of a brush arbor, which was in front of the cabin, and some ten or twelve feet wide. From that point he again called Woods McLel-

lan. Woods answered, and the accused then asked him why he went to town and reported him as he did. Woods replied, " It is a d—d lie," and came to the door of the cabin. The accused then said, " The papers say that you did it." Woods said, " It is a d—d lie, and, Mr. Lester, you have been making threats about me, and we will settle right here which of us is the best man," and immediately commenced to advance upon the accused. The accused said, " Stop," but Woods still advanced upon him, and he gave back and said, " Stop, Woods, and put up that pistol, or I will shoot you." Woods still continuing to advance, the accused said, " Stop," and fired. Thereupon Woods staggered back towards the door, when the accused fired his other barrel, and Woods fell with his head near the door-step. The accused then stepped to where deceased was standing when shot, and stooped down and picked up a pistol, which he brought to witness. It was cocked, and witness recognized it as the same pistol which he had seen in the hands of the deceased the morning previous.

The above is almost literally the first account given by the witness of what transpired at the cabin ; but it appears by the statement of facts to have been considerably modified in the subsequent course of his examination by the state, during which he stated that he did not see deceased have a pistol during the difficulty, nor see the accused pick up a pistol, but did see the latter stoop, " as if picking up something," and that accused then came to where witness was with the horses, and handed witness something, saying, ' Here is that pistol.' " Witness could not then see the pistol well enough to say whether it was the same pistol handed to the deceased by the accused the previous morning ; and witness, in fact, would not swear that it was the same.

The witness further proved that the accused did not make any further search for stock in the field, but that they went from the cabin to the house of the father-in-law of the

accused, where the wife of the accused then was, and they remained there that night. "Next morning," says the record, "defendant showed witness a pistol which was the pistol defendant had given deceased the morning before ; but witness could not say whether it was the same pistol defendant brought him at the time of the killing, or not."

Dock Price, a freedman, sworn for the state, testified that he lived on J. T. Price's place, about half a mile from the defendant's ; that on the morning of September 17, 1876, the accused and the witness Resley came to witness' house, and accused said, "Dock, my wife and one of the girls have been over to my place and have come back, and say that there is a man lying over there before Woods' door, and I want you to go over with us and see who it is." Witness replied, "Let him alone ; you need not care." The accused said, "I don't like to have one lying about my place ; come and let us see who it is ;" that witness went with them, and on the way the accused said, "Dock, Woods had me arrested for having that fight with Mr. Bob Houston, and for carrying a pistol, and when we meet again I intend to give Woods a beating, and then one place will not hold us both any longer." When they found the dead man to be Woods, witness said to the accused, "Whoever killed Woods will suffer for it ;" and the accused replied, "I don't know who could have enough against him to have killed him."

John Lamkin, for the state, testified that he was a deputy sheriff, and summoned the coroner's jury who held an inquest over the body of the deceased on September 17, 1876 ; that the accused was present at the inquest and was sworn as a witness, and testified that he did not know anything about who killed the deceased.

The jury returned a verdict of guilty of murder in the first degree, and assessed the punishment at death.

The accused moved for a new trial. His motion assigned the usual causes, and also those specially discussed in the

opinion of this court.　The affidavit of the juror Baldridge was filed in support of the motion, so far as it attempted to question his qualifications.　The motion was overruled, and the accused duly reserved his bill of exceptions.

The record discloses the fact that the witness Resley had been tried in an examining court as a *particeps criminis.*

*R. Lyles, A. M. Crockett,* and *M. Martin,* for the appellant.　The court certainly erred to the prejudice of appellant by applying a test to the jury wholly unknown to, and unauthorized by, the law.　Appellant is a white man and a democrat; the deceased.was a negro, and, of course, a republican.　On account of the test to the jury, no juror was permitted to try the case until he had, in effect, taken an oath that he regarded a negro as highly as he did a white man.　By this means jurors of the political belief of appellant were excluded, although thoroughly and legally competent to try the case, and appellant was tried by his political enemies, with the question of race and color fairly raised and at issue.

The court erred in the instructions to the jury upon the trial of this cause, and especially in the 4th charge, relative to self-defense.　"The jury are charged that the defendant cannot rely on the law of self-defense unless the proof shows that, at the time of the killing, the deceased was doing some act showing, in itself, a design upon the part of deceased to kill the defendant."　Under this charge the jury was prohibited from finding the appellant not guilty, even though the proof showed clearly that, at the time of the killing, the deceased was saying and doing things well calculated to convince appellant that deceased was about to do him some serious bodily injury.　"The attack upon the person of an individual, in order to justify homicide, must be such as to produce a reasonable expectation or fear of

death, or some serious bodily injury." Pasc. Dig., Art. 2230; 37 Texas, 353; 12 Texas, 462; 33 Texas, 505.

In the 3d subdivision of the 4th charge the court gives the law applicable to the case if it had been shown that appellant called the deceased out of the cabin with the intention of killing him, but does not give the law of the case if it appeared that the deceased was called out for any other purpose.

This part of the charge, we insist, was not authorized by the evidence; and, even if it had been authorized, it was error to fail to further charge what the law was if deceased was called out for any other purpose. 44 Texas, 473.

In view of the language of the court in said 3d subdivision of the 4th charge, and the facts proved in the case, we think the court should have given the 4th instruction asked by appellant, as it seems that every man has a right to be at his own house and premises without exciting a suspicion that he is there to kill some one.

That the verdict was contrary to the law and evidence we think there can be no doubt. On this point alone we think we might rest the case, but because life is the forfeit by the terms of the verdict, we have pointed out other glaring errors prejudicial to the appellant. We submit in all candor that the proof in the case does not warrant a verdict of murder in the first degree, and that the facts proved do not form the basis for a verdict even of murder in the second degree.

*George McCormick*, Assistant Attorney General, for the State. This was a case of cold-blooded assassination, or the prisoner is guilty of nothing. There is no half-way ground about it, and the court sufficiently explained the law governing such cases.

Indeed, it appears that the prisoner ought not to complain; the charge was more favorable to him than he had any right

to expect.   The jury were instructed upon the degrees of murder, upon the law of manslaughter, and even of self-defense.   How this case can be possibly tortured into a case of manslaughter or self-defense is known only to the counsel who represented the prisoner.   The evidence shows that the prisoner bore the deceased ill-will, and had threatened him.   It also shows the cause of this previous ill-feeling, and that he went with his friend and "*pal*," in the dead, dark hour of midnight, armed with a shot-gun, called him out, and foully murdered him ; and, to make the matter worse if possible, the next day he denied knowing anything about the killing, while upon oath before the coroner's jury.

In view of the fact, which certainly appears from the record in this case, that substantial justice has been done the prisoner—that none of the errors complained of can be considered material, or, if corrected, would authorize a different verdict—I ask this court to affirm the judgment, and let the majesty of the law and public justice be vindicated.

WHITE, J.   At the November term, 1876, of the district court of Milam county, the appellant in this case, who is a white man, was tried for the murder of one Woods McLellan, a negro, charged in the indictment to have been committed by him in Milam county, on September 16, 1876. The trial resulted in his conviction for murder in the first degree, the punishment being assessed at death.

With regard to the jury which tried the case we find two questions presented in the motion for a new trial and bill of exceptions, and which are also assigned as error.   The 1st is that, in testing the qualifications of the jurors, the court permitted the county attorney, over the objections of the defendant, to ask the jury " if they could return the same kind of a verdict against a white man for killing a negro that they would against a white man for killing another white man, upon the same evidence."

The 2d objection is that " the juror J. B. Baldridge was accepted as a juror, and acted as a juror, and participated in the finding of the verdict in this case, without having been tested as to whether or not he was a householder in Milam county, or a freeholder in the state of Texas, and because said juror was not in fact a householder in Milam county, or a freeholder in the state of Texas."

Our statute entitled " An act to regulate grand juries and juries in civil and criminal cases in the courts of this state," approved August 1, 1876, and which took effect August 18, 1876, provides:

" Sec. 1. That no person shall be qualified to serve as a juror on the trial of any cause, civil or criminal, unless he be a legal voter, a citizen of this state, a freeholder in this state, or householder in the county in which he may be called to serve, of sound mind and good moral character; *provided*, that an inability to read or write shall be a sufficient cause for challenge, without being charged to either party." Acts Fifteenth Legislature, 78.

" Sec. 26. The fact that a juror is a witness in the case; that he is directly or indirectly interested in the case; that he is related within the third degree, by consanguinity or affinity, to either of the litigants, or to the defendant in any criminal case; or that he does not possess the qualifications of a juror enumerated in this act; or that he has served as a juror for one week in the district court within six months preceding, or in the county court within three months preceding; or that he is biased or prejudiced in favor of or against either party, or in favor of or against the defendant in a criminal case; or that he is unable to read or write; or that he is related within the third degree, by consanguinity or affinity, to the person injured by the commission of the offense with which the defendant in a criminal case is charged, or to the private prosecutor, if there be one; or that he served on the grand jury which found the bill of

indictment ; or that, from hearsay or otherwise, there is estab-
lished in the mind of the juror such a conclusion as to the guilt
or innocence of the defendant as will influence him in his
action in finding the verdict, shall be a good cause for chal-
lenge.''

These provisions, it is contended, lay down all and the
only rules for testing the qualifications and disqualifications
of jurors, as at present known to our law.    This position is
doubtless correct so far as section 1, as above quoted, is
concerned, but it is to be noted with reference to section 26
that, whilst it provides that the grounds of either of them
therein stated '' shall be a good cause for challenge,'' it
nowhere says that these are the only grounds.

And, to show that it could not have been the legislative
intent to limit the grounds of challenge exclusively to the
causes enumerated therein, it is only necessary to refer, by
way of illustration, to the case of *Lyles* v. *The State*, 41
Texas, 172, wherein it was held '' that, though the Code
does not in express terms make the inability of the jury to
speak and understand the language in which the proceedings
on the trial are conducted a ground of disqualification, a trial
by such a jury is a violation of section 16, Article 1, of the
Bill of Rights.''    It is true this decision was made under the
Constitution of 1869–70, and under the provisions of the
old law as to the causes of challenge of jurors (Pasc. Dig.,
Art. 3041) ; still, the reason for the rule, and the rule itself,
is in no manner changed by a change in the law.

And the same may be said of '' mental defect,'' which,
under Paschal's Digest, Article 3040, was a challenge for
cause to the particular juror.    It certainly cannot be that
this is no longer a good cause simply because the legisla-
ture omitted it in the enumeration of causes in their last
enactment.    See *Caldwell* v. *The State*, 41 Texas, 86.

The same might be said with regard to '' conscientious
scruples about inflicting the death penalty '' in capital cases.

Will it be contended that jurors cannot be interrogated upon this subject as was provided for in Paschal's Digest, Article 3041, simply because as a specific ground of challenge that cause is not set out in section 26 of the act of 1876? If so, the death penalty had as well be expunged from our statute books.

These three illustrations are given as pointed examples of the result to which the position assumed would lead in defeating the very object and purpose of the statute, which is to secure a fair and impartial administration and vindication of the law, by means of a fair and impartial jury. A defendant is not limited in the number of challenges for cause to individual jurors, on any of the grounds specified in the statute. *Williams* v. *The State*, 44 Texas, 34.

It is gravely urged in the brief of counsel, from which we quote, that "appellant is a white man and a democrat; the deceased was a negro, and, of course, a republican. On account of the test to the jury, no juror was permitted to try the case until he had, in effect, taken an oath that he regarded a negro as highly as he did a white man. By this means jurors of the political belief of appellant were excluded, although thoroughly and legally competent to try the case, and appellant was tried by his political enemies, with the question of race fairly raised and at issue."

We cannot express too forcibly our condemnation of such arguments and appeals to political passions and prejudices. The very fact that they are made proves the necessity of guarding against them in the execution of the law. The law, we think, has properly made it a crime equal in magnitude to kill a negro as to kill a white man, and denounces its punishment for such crime equally alike, without reference to race, color, previous condition, or political considerations. If there be, as the argument indicates, in the country, men who feel and believe, morally, socially, politically, or religiously, that it is not murder for a white man to take the life

of a negro with malice aforethought, then we unhesitatingly say such men are not fit jurors, in contemplation of law, to try a white man for such a crime.   Men holding such opinions cannot be said to be without bias or prejudice in favor of a white man who is the defendant; and bias or prejudice is, as we have seen, one of the grounds of challenge for cause set forth in the statute.

The court did not, therefore, err in permitting the question to be asked, in order to elicit with certainty this fact in regard to the bias or prejudice of the jurors ; and the statute declares that "the court is the judge, after proper examination, of the qualifications of a juror."   Pasc. Dig., Art. 3044.

Besides these reasons, suffice it to say that there is absolutely nothing in the record which goes, in the slightest degree, to warrant or support the bold and broad assertion, of defendant's counsel "that appellant was tried by his political enemies."   Nor is it shown by the record that any jurors were excluded on this ground, or that the defendant did in fact exhaust the challenges which the law allowed him in the formation of the jury.   If true, the fact should have been made to appear by bill of exceptions, before this court will, on appeal, consider such causes of special challenge to the individual jurors.   *Bowman* v. *The State*, 41 Texas, 417.

The objection to the juror Baldridge was that he was not a freeholder of the state, or a householder in the county ; and it is stated that he was accepted as a juror without having been tested as to his qualifications in this particular. This objection is presented for the first time in the motion to set aside the verdict and for a new trial.   It is contradicted by the recitals of the judgment to the effect that "the jurors [naming them] had been duly tried, impaneled, and sworn."

The rules of practice are that, "in impaneling the jury, the

person to be tried as to his qualifications shall first be sworn in every case to answer questions, and shall be interrogated touching his qualifications as pointed out in chapter 3, title 5, of the Code of Criminal Procedure. Pasc. Dig., Art. 3027. (Of course, chapter 3 having been changed by the act of 1876, as heretofore quoted, the qualifications of the juror will now be tested by the provisions of the latter act.) Again, "in testing the qualifications of a juror, he shall himself be sworn to answer questions, and any other proof may be also heard touching the subject." Pasc. Dig., Art. 3042.

The latter clause of Article 3043 expressly provides that "it is the duty of the court, in every case of felony, to cause questions to be asked the juror, for the purpose of testing his qualifications under the 2d and 3d subdivisions of Article 3040." One of the objections named in the 3d subdivision of Article 3040 was that the person proposed as a juror was not a resident of the proper county, and "a householder in that county, or a freeholder in the state," the provisions of the old law on this point being similar and almost identical with that of section 1 of the act of 1876.

We cannot agree with what seems to have been the intimation clearly expressed by the court in *Brennan* v. *The State*, 33 Texas, 266, that the fact that a juror in a criminal case was neither a freeholder nor a householder would not invalidate the jury. The legislature must have intended these qualifications, or they would not have prescribed them. "Unnumbered evils would flow from permitting courts to practically annul statutes, by refusing to be guided and governed by them under the plea that it could make no difference with those for whose protection or benefit the statute was designed. Were such a course pursued, the justice and propriety of a statute, rather than the statute itself, would come to be regarded by courts, and the latter would arrogate to themselves the right to obey or

disobey the law, according as it should meet their approbation or the reverse." 2 Gra. & Wat. on New Tr. 225.

The law declaring that no person who is not a freeholder or a householder shall serve upon juries is founded upon grounds of public policy, and although this defect does not affect the capacity or moral qualification of the juror, and is strictly technical, yet the law is too positive to be dispensed with. If this qualification can be ignored, then any of the others named in the statute could, equally as well and for the same reasons, be held for naught, whenever circumstances or convenience required it.

The case of *Maloy* v. *The State*, 33 Texas, 599, where a similar question was presented, was decided upon the hypothesis that the Constitution of 1869–70 abrogated all the qualifications of jurors as provided by statute, and made the qualification simply to depend upon the fact that the juror was a qualified voter. These two cases cannot be held as authority against the qualifications as prescribed and demanded by the 1st section of the act of 1876, which is the law as it now exists upon this subject.

It can scarcely be credible that a court, with the plain injunctions of duty prescribed for its action in the rules of practice above quoted, could or would fail to test the qualifications of jurors to the fullest extent by the preliminary examination, in capital cases, and a plain case of failure to do so, properly taken advantage of, would undoubtedly be a good ground for a reversal of the case. As stated above, however, in this case the objection is contradicted by the judgment, and is, moreover, presented for the first time in the motion to set aside the verdict.

Now, the rule seems to be well settled that, if there was any objection to the competency of a juror which would have been good cause of challenge, "it should have been urged when the jury was impaneled (8 Yerg. 607 ; 2 Nott & M. 261) ; or the defendant should have adduced at

least the evidence of his own affidavit to the fact that the objection was not known to him ; * * * he should at least have submitted his affidavit to that effect in support of the motion." *McGehee* v. *Shafer*, 9 Texas, 20.

In *Roseborough* v. *The State*, where the motion for a new trial was partly predicated upon the fact that one of the jurors who tried the case was not a citizen of the county, our supreme court said : " The court did not err in refusing to grant a new trial on the ground of the alleged incompetency of one of the jurors by whom the case was tried. This was not one of the causes for which, in cases of felony, the Code says new trials shall be granted. Code Cr. Proc., Art. 672. But if the juror was disqualified when he was passed upon and accepted by the parties, and this fact was unknown to appellants and their counsel, though it does not so appear in the record, it is not shown that this was not from a want of proper inquiry. Code Cr. Proc., Art. 577 ; 43 Texas, 570. See, also, *Thomæ* v. *Zushlag*, 25 Texas (Supp.), 225.

In this case the defendant does not support the motion by his own affidavit, nor does he show that the disqualification might not have been known and ascertained by him, upon proper inquiry, before accepting the juror. Gra. & Wat. on New Tr. 465 ; *Johnson* v. *The State*, 27 Texas, 764 ; *Buie* v. *The State*, 1 Texas Ct. of App. 452 ; *Trueblood* v. *The State*, 1 Texas Ct. of App. 650.

If it be true that the qualifications of the juror were not tested by the court as its duty required, the defendant had the right, and should have asserted it, to have the necessary questions as to the qualifications prescribed by the statute propounded to, and the answers given by, the juror on his *voir dire*. Had he insisted upon such right, and it had been refused by the court, such refusal would have been good ground for bill of exceptions, and a reversal of the case on appeal.

The affidavit of the juror in this case was taken and sub-

mitted to the court for its consideration in determining the matter.   The affidavit is as follows :

" *The State of Texas* v. *George Lester :*

" Personally appeared, before the undersigned authority, J. B. Baldridge, who, being duly sworn by me, upon oath says that he was one of the jurors who sat upon and tried the above-styled and numbered case, on the 17th and 18th days of November, A. D. 1876, and returned into court the verdict in said cause, finding said defendant, George Lester, guilty of murder in the first degree, and assessing his punishment at death, and that he, affiant, is not a freeholder in the state of Texas ; but that he, affiant, rents land for cultivation from P. M. Kolb, of Milam county, Texas, and that he, affiant, lives in a house situated upon said rented premises, sleeps in said house, has his own furniture in said house, keeps all his things in said house, and has all things kept and used in said house, except his eating, and his eating he does at the house of Mr. P. M. Kolb, with his family ; that affiant has no family, but is a single man, and that his brother, J. W. Baldridge, younger than himself, lives with him in said house—rented premises ; that affiant has his own farming implements and his own stock on said rented premises, and lives wholly separate and apart from Mr. P. M. Kolb, except affiant's eating, aforesaid."

This affidavit was signed and sworn to by the juror, and presented, no doubt, for the purpose of supporting the motion, as is provided may be done by subdivision 8 of Article 3137, Paschal's Digest.

If the exception were not otherwise wholly objectionable as to the time and manner of its presentation, as shown above, this affidavit of the juror, we think, would have been amply sufficient to have met and defeated it.   The statement therein contained shows conclusively that the objection was not well taken ; and the juror was unquestionably a householder, in contemplation of law, if the statement was true,

of which there seems to be no question. As used in the statute, the word "householder," though otherwise held, is, we take it, synonymous with "housekeeper," which is. defined by Bouvier to be "one who keeps house." He further says, "in order to make the party a housekeeper, he must be in actual possession of the house," citing 1 Chit. 288–316 ; 1 B. & C. 178 ; 2 T. R. 406 ; 1 Bott, 5 ; Bouv. L. Dic., title Housekeeper.

Mr. Burrill, in his law dictionary, defines a householder to be the occupier of a house.

"Householder—one who keeps house with his family ; the head or master of a family, who has a house." *Woodward* v. *Murray*, 18 Johns. 400.

Even taking this latter as the correct definition, it does. not necessarily imply that a householder must be a married man.

The juror in question rented the house ; had actual and complete control of it ; occupied it with such family as he had, and used it for all purposes, except eating. We are of opinion he was a competent juror.

With regard to the charge of the court, the 4th division and the various subdivisions under it, instructing the jury as to the law of self-defense, are specially complained of as. ground for error. The first objection to this portion of the charge is that it limits the rights of self-defense and its justification to the fact that it "reasonably appeared to defendant, by the acts, or the words coupled with the acts, of the. deceased that it was then his purpose to kill defendant," when the justification would have been as perfect and complete had the purpose and intent of deceased been to do. him "some serious bodily injury," as to kill him. Pasc. Dig., Art. 2230. Such an instruction as that contained in the original charge of the court was clearly obnoxious to this objection, and, consequently, erroneous *(Perry* v. *The State*, 44 Texas, 473) ; but the error was corrected, and

corrected by a special instruction, which was asked by defendant, and given by the court in the following language, viz.: "At the instance of defendant's counsel, the court instructs the jury that, if they believe from the evidence that at the time of the killing it reasonably appeared by the acts of Woods McLellan, coupled with his words, that it was the intention of deceased either to kill defendant or do him some great bodily harm, he would be justified in killing the deceased in his own self-defense." The *addenda* of the court to this instruction was: "The above charge is given, to be considered in connection with the rules laid down on the question of self-defense, in the charge of this court." Thus the defect was fully cured, and the charge made to conform to the law as quoted.

Four other special instructions were asked by the defendant, and refused by the court, and this is also complained of as ground for error. Suffice it to say that, so far as the 2d and 3d instructions thus asked were concerned, they related entirely to the presumption of innocence and the reasonable doubts, which had already been given by the court in the 8th paragraph of the general charge, in these words: "Every one accused of crime is presumed to be innocent until his guilt is proved, but this presumption of innocence may be overcome by evidence establishing guilt, and, when so overcome, must yield to the evidence; and it is for you, as the sole judges of the weight of the evidence and of the credibility of the witnesses, to say whether it has been overcome and the guilt of the defendant has been proved; and if, considering and weighing all the evidence, you have a reasonable doubt of the guilt of defendant, acquit him." As to the 1st and 4th special charges asked of the court, we are of opinion the court did not err in refusing them—the 1st in the light of the testimony, and the 4th as it would have been a charge upon the weight of evidence.

As a whole, the general charge does present the law

29

applicable to the different degrees of homicide—though, with regard to murder in the second degree, not, perhaps, so explicitly as it should to enable the jury to draw the distinction between the two higher degrees.

. The most serious objection to the charge of the court, and one which will necessarily require a reversal of the case, grows out of the 3d and 5th subdivisions of paragraph 4 of the charge. The language used is:

"3d. If you believe from the evidence that defendant went to the house of McLellan, and called him out with a view of killing him, and that, when called out, deceased and defendant fought or attempted to fight mutually, and attacked each other simultaneously, and that defendant killed McLellan in the fight, he cannot justify the killing on the ground of self-defense."

"5th. If you believe from the evidence that the defendant went to deceased's house with the intent to kill him, and for this purpose called him out, and sought and had a difficulty with him in pursuit of the design to kill him, and did kill him, he is guilty of murder, although you may believe, also, that at the time deceased was killed he was trying to kill defendant."

These instructions were correct as far as they went, except that the judge failed to charge the jury of what degree the murder would be, under the circumstances. But, having given them, the court should have further instructed the jury as to the consequences in case defendant went to the house of the deceased for other purposes, without intending to kill him, and did kill him upon sudden passion and without premeditation. The idea is perhaps as clearly conveyed as could be desired in the syllabus of the case of *Perry* v. *The State*, and in so far we adopt the language, as follows: "An instruction to the jury upon a case of a conflict brought on by the accused, giving only the law applicable if the conflict had been brought on with intent to kill, is erroneous;

the failure to instruct the jury upon the law had the conflict been brought on for any other purpose might convey to the jury the impression that the conflict had been brought on with intent to kill." 44 Texas, 473.

In view of the fact that for the reasons above set forth the case must be reversed, we deem it unnecessary to discuss or comment upon the evidence adduced on the trial of the case, or any other question presented in the record or brief of counsel.

The judgment of the lower court is reversed and the cause remanded for a new trial.

*Reversed and remanded.*