## BELDOMERO MARTINEZ v. THE STATE.

No. 21615. Delivered May 14, 1941.
Rehearing Denied June 25, 1941.

314

The opinion states the case.

*Fryer & Milstead,* of El Paso, for appellant.

*Roy D. Jackson,* District Attorney, and *Harold S. Long,* Assistant District Attorney, both of El Paso, and *Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant was convicted of murder without malice, and sentenced to serve four years in the State penitentiary.

The testimony presents many contradictions, it showing from the State's standpoint the pursuit and slaying of one Jesus Navarro by appellant and his brother Jose Martinez acting together, although the question of which one of the two struck the final fatal blow is left in doubt. Nevertheless the fact that one of these two brothers did strike such blow seems reasonably certain. The testimony does show that these two

brothers had a nephew, Juan Gomez, who had previously engaged in a difficulty with the deceased, and Juan had received some cuts across his stomach in the encounter. The result of this encounter had been communicated to the brother Jose Martinez who, although living in California, was spending some vacation time with his relatives in El Paso. On the night of the homicide, at a dance at Liberty Hall in El Paso, the deceased, with a girl friend, was in attendance, and Juan Gomez and his uncle, Jose Martinez, had some kind of an altercation with deceased relative to the previous trouble with Juan Gomez, which altercation resulted in the deceased being caused to leave the hall. The appellant's brother and nephew, together with the nephew's girl friend, soon thereafter entered an automobile, when they soon contacted appellant, who joined them, and while driving towards their home decided to partake of some beer, and Jose Martinez got out of the car and started across the street to a bar. In the meantime the deceased had taken his girl friend near her home and left her. The testimony at this point is not only confusing but also contradictory. It seems from the State's standpoint that a car containing from four to six men drove up near where the deceased was standing in the neighborhood of this bar, and these men started after the deceased, who said "there they come," and who began running away from these men. That these men passed the California Poppy restaurant, and a police officer, Wulfjen by name, saw three men pursuing the deceased, and he came out of this place and caught up with them, and we quote from his testimony:

"At the time that these boys first passed there Navarro was leading when they passed the California Poppy. Three men were chasing him; that is all I saw.

"When they got there close to the Roma Hotel they were in a bunch there at that time. Yes, Navarro was there at that time. What I saw happened there, they were just all fighting there and I just got hold of two of them from the rear and jerked them back and then Navarro broke and ran and then Baldomero and Joe was after him.

"No, I didn't see a knife in any one's hand at that time.

"I didn't know who those two men were that I was pulling out; at that time I didn't know.

"Yes, at that time I did know that Baldoremo was one of the men that was in the fight. Baldoremo was after Navarro with

a hammer in his hand; it was a ball peen hammer I would say would weigh one and three-quarters of a pound. That was larger than an ordinary automobile hammer, some, yes, I saw this defendant strike Navarro with that hammer at 404 South El Paso street. But prior to that time I didn't.

"Yes, when I got to the Ramona Hotel one of them was bleeding, had blood on his shirt right here. Yes, that was one of the boys I pulled out, I couldn't say just which one it was at that time. When they angled across the street to the East side of El Paso street Navarro was about seven or eight feet ahead of them. There were two men after him. Yes, Baldomero here was one of the men. When they crossed the street Navarro ran to 404 South El Paso and there is a kind of a set-in and a hardware store and he turned there and went to fighting back, and just as I got there Baldomero was up on his toes and made a long reach and that way he caught him here with a hammer and just as he hit him there with a hammer I caught him and told him to drop the hammer and he turned and threw it down to 410 in front of Coffee Joe's place.

"I caught him by the belt in front.

"When I told him to drop the hammer he threw it down the street and another boy picked it up just as it hit the sidewalk and went on down the street with it.

"Yes, I saw another man there at that time, yes, another man that was chasing him along with Baldomero; that was Joe Martinez, yes, the boy seated back here.

"When Jesus Navarro stopped at 404 and started fighting back and at the time that Baldomero raised up on his toes and struck him across the face with that hammer Joe, he hit him about the same time right here, indicating a blow with the closed hand to the left breast. I couldn't see what he had in his hand; he just hit him a blow like that with his hand. About the same time Baldomero caught him across here with his hammer, almost at the same instant, they hit right about the same time. Then I grabbed Baldomero and told him to drop the hammer. I looked around and Navarro was still standing at that time and I told King to go and call the wagon for me and the crowd came running in across the street and when the crowd got there Joe Martinez reached in and grabbed my

hand loose and at that time there were so many around there I couldn't do a thing. Yes, when I had this defendant by the belt there Joe, the boy who had struck this blow in Navarro's breast, grabbed my hand, he jerked my hand loose out of the belt and then they broke and ran. They went down the East side of El Paso street, South towards Second street. The two boys broke loose and ran from the crowd and down the street."

Appellant did not take the stand; his witnesses, however, told a different story from the above, which was evidently not given full credence by the jury. It was claimed that upon seeing the deceased at the dance Jose Martinez asked the deceased why he cut Gomez, and the deceased replied that he would cut Jose Martinez; that the deceased was ejected from the hall, and Juan Gomez, his girl and uncle Jose started home; on the way they met the appellant and told him about the trouble at the dance hall; that all three of the men and the girl in the car started to the beer hall to get a drink. It was then that the deceased came up in the street in front of this car and began slashing at Jose Martinez with a knife, who ran back to the car and obtained a hammer therefrom. Gomez then told appellant that this was the deceased, and appellant then got out of the car and entered the affray. It seems that Jose Martinez then dropped the hammer and appellant got it. It was claimed that at the time Jose Martinez came back to the car for the hammer he was bleeding from a cut over the region of the heart. It was also claimed by the witness that appellant was calling for an officer, desiring the officer to stop the deceased, who was running away. The witness Gomez also testified that neither the appellant nor Jose Martinez had a knife; that they never carried a knife. The State elicited from this witness that after he had told his uncle Jose of how the deceased had cut witness, his uncle said some day he might get the deceased in a fist fight and see if he was a man with his hands.

J. L. Sandoval, a U. S. custom inspector, was a State's witness and saw only a portion of the difficulty, but did bear evidence to the exit from the scene by appellant, his brother and Gomez, as follows:

"When these men came South on El Paso street and got in this car, when they came to the car he, the defendant, he came close to where I was and he said in these words in Spanish which I interpret: 'that is the end of this white pimp son of a bitch.' He said 'look, he cut me all over' and he had blood all

over his hand here, and he made his hands like that (indicating) and he says 'look, he cut me all over and that is the end of that white pimp son of a bitch,' that is the way I interpret these words but he said in Spanish just like I said awhile ago. Yes, he said 'look, he cut me all over but that is the end of that white pimp son of a bitch.' They got in the car and left there. It was this defendant that was hollering in Spanish 'let's go, let's go.' They got in and drove off in the car; they went East."

There was further evidence of the bad reputation of the deceased, and the good reputation of the appellant was proven by many witnesses.

In the brief this appellant's attorneys filed herein we find numerous references, as well as a certified copy of a verdict in another cause than this, and one tried and disposed of after the trial of this cause. These are matters that have no bearing upon this case and should not have been adverted to nor included in the brief filed herein. Upon motion of the State all such matters are ordered stricken from appellant's brief and will not be considered by this court.

Appellant's bill of exceptions No. 2 is the first one appearing in the record, and complains because the trial court refused to give to the jury a charge directing them to acquit the appellant because of the insufficiency of the evidence to show that it was appellant's hand that struck the blow that caused death. The court gave a proper instruction upon the law of principals, and according to the testimony it is shown that appellant and his brother were acting together, that they came to the scene of the trouble together, and were together making an assault upon the deceased, and that as a result of such an assault the deceased lost his life; that again they were together enlarged from the custody of a peace officer and fled from the scene together. We think the jury had the right to say that their acts came under the doctrine of principals acting together in the commission of this homicide.

Bill of exceptions No. 3 relates to the trial court's failure to allow the nephew, Juan Gomez, while on the witness stand, to exhibit to the jury the scars on his body which he claimed to have received in a different encounter than the present one with the deceased, Gomez claiming that he had previously exhibited such scars to Jose Martinez, a co-principal with appel-

lant. The witness was permitted to say that he had shown such scars to his uncle Jose, but the appellant then desired to show the jury what witness had shown to his uncle. There was no denial of any kind that witness had received such scars in an encounter with deceased, and we do not think their exhibition in the presence of the jury could neither add to nor detract from his statement that he had shown such scars to Jose Martinez.

Bill of exceptions No. 4 relates to the failure of the trial court, upon motion by appellant, to withdraw from the jury the statement of Juan Gomez that his uncle Jose said "that he might get him (deceased) some day and fight together with fists with him." This bill bears the following qualfiication, which we think evidences the correctness of the trial court's ruling:

"Juan Gomez had theretofore on direct examination by defendant's atty. testified that he had told Joe Martinez that the deceased had cut him, Juan Gomez, and had shown the wounds to Joe Martinez and had told Joe Martinez of other cuttings by the deceased. Later on cross-examination, Juan Gomez was asked by State's attorney what Joe Martinez said after Juan Gomez told him about deceased having cut him, Juan Gomez, and Juan Gomez answered that Joe Martinez had said that he might get him some day and fight together a fist fight with him. This testimony was received without any objection by defendant. Later in the trial a written motion to withdraw and exclude the said testimony was presented by the defendant and overruled by the court."

We think this testimony admissible as being the remaining portion of a conversation introduced by appellant, and as also showing motive and ill will upon the part of a co-principal.

We are also of the opinion that the trial court correctly charged the law on self-defense, and after having given such charge in the succeeding paragraph, he applied such doctrine upon the proposition of defense of another, instructing the jury that such person would be justified in acting in defense of another against unlawful violence as it appeared to him, in the same manner, and to the same extent as he would have in acting in his own defense. This disposes of bills Nos. 6 and 9.

Bills of exceptions No. 7 and 10 relate to the same matter and can be treated together. It was appellant's contention, in-

ferentially drawn by a remark testified to by the nephew, Juan Gomez, that, having perceived the fact that Jose Martinez was cut with a knife, the appellant was pursuing the deceased with this hammer in his hand for the purpose of apprehending the deceased and holding him for the police upon their arrival. In other words, that appellant was attempting to arrest the deceased for an assault upon his brother. The testimony evidencing such intent is rather meager, and comes only from the nephew, Juan Gomez, who says that appellant was calling for the police at the time these men were in pursuit of the fleeing deceased. He testified that "He (the appellant) picked the hammer up and went up to that boy (the deceased). I think he was yelling for an officer to stop him (the deceased) * * * Yes, sir, he was calling for an officer; yes, he was trying to stop him to have him arrested. * * * When Baldomero was calling for an officer, an officer came out of the California Poppy and went after him. When Baldomero stopped and told the officer he had cut him."

It is to be noted that appellant did not take the stand, and from the officer's testimony we find no mention of any request for the presence of police of any kind, but it seems that his first impression of any trouble arose when he saw three men running after the deceased.

We are not impressed with the soundness of the doctrine that under the circumstances here indicated that a charge should have been given to the jury that the appellant had the right to pursue and arrest the deceased because of the mere fact that he had called for the police upon ascertaining that the brother Jose had been cut by the deceased. It is also worthy of note that upon the appearance of an officer appellant wrested control of his brother from the officer and he and his brother fled from the scene. It is true that Art. 212, C. C. P. gives to any person the right to arrest without warrant any person committing a felony or a breach of the peace in such person's presence, but we do not think such statute contemplates a counter attack upon the part of the person thus attempting to arrest, and surely not the taking of the life of the fleeing malefactor. The testimony merely shows that at the time of the pursuit of the deceased he had merely cut Jose Martinez and was fleeing from at least three pursuers when appellant possessed himself of the hammer. This wound seems not to have caused a great deal of fear of death or serious bodily harm,

as it was not attended to by a physician, and seems to have resulted in no great inconvenience to Jose. It is not shown why nor for what appellant contends he was attempting to arrest or hold the deceased; if for the cut on his brother, then such would probably appear to have been but a misdemeanor, and he would certainly not have the right to engage in a matter that would culminate in the death of the pursued. We have held in the case of Tiner v. State, 44 Tex. 128, that:

"It is also true that it is the duty of every citizen to submit to lawful arrest. There is, however, a broad distinction between resistance and avoidance; between forcible opposition to arrest and merely fleeing from it. (See The State v. Anderson, 1 Hill, (S. C.,) 346.) There is no rule of law that he who flees from attempted arrest in cases of misdemeanor thereby forfeits his right to defend his life. It is certainly possible for the officer of the law to commit a felony by shooting at a man or by other excessive violence even when attempting his arrest, (Caldwell v. The State, 41 Tex., 86,) and it would follow that the party thus feloniously assaulted might defend his life. (The State v. Oliver, 2 Houston, (Del.,) 605; or referred to in Harrigan and Thompson's Cases of Self-Defense, p. 716.)"

Bill of exceptions No. 8 relates to two questions, one question asked Bob Drennan, a policeman of El Paso, relative to whether he had occasion to bring Jose Martinez back from California to El Paso; the other question was directed to Juan Gomez, the nephew, as to whether his uncle Jose Martinez left for California the morning after this homicide. To both questions the trial court sustained an objection, and instructed the jury not to consider such questions, whereupon the appellant moved the court to declare a mistrial and discharge the jury, which the court refused to do. This testimony was intended to elicit evidence of flight, and as such we think was endeavored to be elicited in good faith by the State's attorney. There had already been testimony given by police officer Wulfjen that while present at the affray that resulted in the homicide he had taken appellant into custody, and was holding him when Jose Martinez, the co-defendant, came up and forcibly took the appellant from the officer, and the two Martinez brothers then ran and jumped in their automobile and fled from the scene, saying "let's go, let's go," and this without objection upon the part of appellant. It was also shown by appellant's witness that this Jose lived in California, and was in Texas merely on a vacation visit. Under the circumstances we fail to see where any serious

error was committed in asking these unanswered questions. Flight of both parties was probably res gestae of the transaction, and flight would still be flight whether it was for a city block or to another state, and when begun at the actual scene we can see no seriousness in showing where the fugitive came to rest. These Martinez men were acting together at the time, and fled the scene together, and the act of one was the act of the other, if the jury accepted the law of principals, as they evidently did. The bill is overruled.

We have examined all bills of exceptions not herein specifically written upon and do not think any of them evidence any error.

The judgment is therefore affirmed.

### ON MOTION FOR REHEARING.

KRUEGER, Judge.

In his motion for rehearing appellant asserts that we erred in several respects in disposing of this case on the original submission. He first contends that we were in error in holding that the trial court did not commit any error in declining to give his Special Instruction No. 2 to the effect that in passing upon the guilt or innocence of the defendant, Baldomero Martinez, the jury may "take into consideration the knowledge, if any, of Jose Martinez as to the dangerous character of the deceased, and his knowledge, if any, of a previous difficulty with the deceased, and his knowledge if any, that the deceased was a marihuana smoker, and the conditions which confronted the said Jose Martinez, as viewed from his standpoint, at the time of the alleged homicide." In our opinion, this charge, if it had been given, would have been on the weight of the evidence in specifically singling out and directing the jury's attention to certain matters and thereby giving undue emphasis to certain facts. Furthermore, any knowledge on the part of Jose Martinez as to the dangerous character of the deceased, unless the same had been imparted to the appellant, could hardly have influenced or justified the appellant in his actions. Consequently the refusal to give this instruction was not detrimental to the rights of the appellant.

Appellant next contends that we erred in holding that the trial court committed no error in failing to instruct the jury that the defendant had a right to arrest the deceased who committed an unlawful assault in his presence, and that in doing

so, he had a right to use all reasonable force necessary to apprehend him. If the evidence had reasonably raised that issue, appellant might have been entitled to such an instruction, but, in our opinion, the evidence wholly fails to raise such an issue. It appears from the testimony in the record that appellant and his co-defendants met the deceased at a dance hall and invited him to fight; that the deceased, in company with another person, left the dance hall and went up town; that appellant and his co-defendants soon thereafter left the dance hall, because, as they claimed, they were afraid that the deceased might return and start a difficulty; that after they had gone up town they saw the deceased on the street; that they got out of their car and started toward him and he began to flee; that they pursued him, ran him down, struck him with a hammer and stabbed him to death; that when the officer appeared on the scene and took hold of appellant, his co-defendants jerked the officer loose, released the appellant and then all of them fled. When appellant reached his car he remarked: "That is the end of that white pimp s-- of a b----." If these facts indicate an intent on the part of the appellant and his co-defendants to arrest the deceased, we admit that we are unable to comprehend the meaning and import of such language.

Appellant's third contention is that there is no evidence that he stabbed the deceased or that his co-defendant, Jose Martinez, stabbed him to death. It is true that no one saw a knife in the hands of either Jose Martinez or the appellant, but appellant had a hammer and he and Jose Martinez were pursuing the deceased. They struck him on the head with a hammer. They overtook him, a struggle ensued, and deceased soon fell to the ground with a number of stab wounds in his chest and in his body, from the effects of which he died before he could be carried to a hospital. The doctor who attended the deceased testified that he found a "stab wound under the left nipple, one above and across the left of the flank and one in the scalp." He examined the one below the left nipple and found that it went into the heart, that is, it penetrated the heart, and that this wound caused the death of the deceased; that these wounds were made with a sharp instrument. The remark by appellant to the effect that "that is the end of that white pimp s-- of a b----" indicates their intent. It occurs to us that it was immaterial whether the appellant stabbed the deceased or whether Jose Martinez stabbed him to death. They were acting together with a common intent and a common design; and the act of one

was the act of both or all, and each is responsible for the act of the other. See Mitchell v. State, 36 Tex. Cr. R. 278.

Believing that the proper disposition of the case was made on the original submission, appellant's motion for rehearing is overruled.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.