## Pearl Goode v. The State.

### No. 14.   Decided November 3, 1909.

**1.—Murder—Evidence—Confession—Statutes Construed.**

Where, upon trial for murder, the State introduced certain written confessions in evidence, which confessions were made by defendant before the grand jury, and were in all respects executed and witnessed in accordance with the Act of the Thirtieth Legislature, such confessions were in no sense public documents, under articles 941 and 942, Code of Criminal Procedure, and were, therefore, not open to the inspection of defendant's counsel in advance of the trial; besides, it appeared that both confessions were, in fact, turned over to defendant's counsel for examination.

**2.—Same—Certified Copy of Indictment—Variance—Change of Venue.**

Where, upon trial for murder, the original indictment and the copies served on defendant were identical in every particular, and the counsel for the defendant failed to point out any variance between them, there was no error; besides, it is doubtful whether this motion should have been sustained, as the case was tried on change of venue, and no objection was made on this ground in the court from which the case was removed.

**3.—Same—Election by State.**

Where, upon trial for murder, only one criminal transaction or act was charged in the indictment in different counts, drawn to meet the possible phases of the testimony, the State was not required to elect. Following Moore v. State, 37 Texas Crim. Rep., 552, 40 S. W. Rep., 287, and other cases.

**4.—Same—Eyewitness—State's Right to Place Witnesses on Stand.**

Upon trial for murder, where the defendant moved to require the State to place an eyewitness on the stand, which it refused, and it appeared clearly that this party was a *particeps criminis*, and in jail as a co-conspirator, the State was not bound to place him on the witness stand and thus be bound by his testimony. Following Lard v. State, 54 Texas Crim. Rep., 570.

**5.—Same—Jurisdiction—Change of Venue—Certified Copy of Indictment.**

Where, upon trial for murder, on change of venue, objection was made to the

jurisdiction because the transcript contained no certified copy of the indictment against the defendant, there was no error in overruling the objection, as the original indictment accompanied the transcript, and was on file with it; besides, there was no exception in the record on this point to the original order changing the venue, and it appeared that the defendant requested the change of venue.

#### 6.—Same—Plea of Not Guilty—Arraignment.

Where, upon trial for murder, the order changing the venue recited that the defendant had pleaded not guilty, and this was duly certified, there was no error; besides, if the record had been silent as to this matter, there would have been no error. Following Caldwell v. State, 41 Texas, 86.

#### 7.—Same—Continuance—Second Application—Want of Diligence.

Where, upon trial for murder, the second application for continuance on its face showed a want of proper diligence, and failed to allege that the absent testimony could not be procured from any other source, and that the defendant had reasonable expectation of procuring the same at the next term of the court, there was no error in overruling same.

#### 8.—Same—First and Second Applications for Continuance.

Where, upon trial for murder, the first application for continuance was made on account of defendant's sickness in the court from which the case was removed to another county, and defendant filed his application for continuance in the court to which the venue had been changed on account of the absent witnesses, the latter was in law a second application. Following McKinney v. State, 8 Texas Crim. App., 626.

#### 9.—Same—Second Application for Continuance.

A second application for continuance must be in strict compliance with all the requirements of the statute, and nothing will be presumed in the aid of such second application. Following Henderson v. State, 5 Texas Crim. App., 134, and other cases.

#### 10.—Same—Charge of Court—Principals.

Where, upon trial for murder, the evidence of the State showed that defendant was present at the time of the killing, which was done by other parties present, and the court properly charged the law of principals and applied same to the facts, there was no error in refusing a special requested charge which eliminated, as an element of the law of principals, that the defendant may have concealed the offenders who did the killing; besides, such special charge was vicious in that it stated that, if the defendant had consented and agreed upon the murder, and was present when it was committed, she could not be held guilty as a principal if she did no overt act at the very time of the killing.

#### 11.—Same—Charge of Court—Confessions.

Where, upon trial for murder, there were certain written confessions of the defendant, executed in accordance with law, admitted in evidence, and the court, upon the issue as to whether they were freely and voluntarily made, properly applied the law to the evidence, there was no error in refusing a special requested charge to the effect that if such confessions contradicted themselves, and could not be reconciled, that they might be discarded by the jury.

#### 12.—Same—Conspiracy—Requested Charge.

Upon trial for murder, where the State's evidence showed a conspiracy between the defendant and others to commit the murder, and the court submitted the defendant's requested charges on this issue in a proper way, and in the chosen language of the defendant, there was no error.

#### 13.—Same—Transcript—Change of Venue.

Where, upon trial for murder, the State's counsel simply asked the court if it was necessary, in order to show jurisdiction, that the transcript in the change of venue proceedings must be introduced in evidence, to which the court answered in the negative, and there was no reference made as to at whose instance

the change of venue was made, and no portion of the proceedings were read in the presence or hearing of the jury, there was no error.

### 14.—Same—Reputation of Witness for Truth and Veracity.

Where, upon trial for murder, a State's witness, on cross-examination by the defendant, the defense imputed the crime to said witness, and predicates were laid for contradicting him, and he was attacked in every possible way by innuendo so as to bring him in discredit, and that the witness was a stranger in the county of the trial, there was no error in permitting the State to prove the witness' good reputation for truth and veracity. Following Harris v. State, 49 Texas Crim. Rep., 338; 94 S. W. Rep., 227, and other cases.

### 15.—Same—Evidence—Contradicting Witness.

Where, upon trial for murder, the trial court first refused to permit the defense to ask a State's witness as to whether or not he had been criminally intimate with the defendant, and afterwards had the witness recalled, and informed defendant's counsel that they could ask this question, which they refused to do, there was no error.

### 16.—Same—Withdrawal of Illegal Testimony.

Where, upon trial for murder, the court had admitted in evidence a conversation of a co-conspirator and the witness touching the former's intimacy with the defendant, and thereafter the court had withdrawn said testimony from the jury, both verbally and in writing, and there was a great mass of evidence tending to show such intimacy, and which was confessed by the defendant, there was no reversible error.

### 17.—Same—Sufficiency of the Evidence.

Where, upon trial for murder, there was sufficient evidence to support a verdict of murder in the second degree, the same will not be disturbed on appeal.

Appeal from the District Court of McLennan. Tried below before the Hon. Richard I. Munroe.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

After the State had introduced in evidence the two confessions of defendant made by her before the grand jury and that they were freely and voluntarily made; that they were made under proper warning, and not in the hope of reward, without fear, etc., the defense sought to show that these confessions were not freely made, and introduced testimony that the defendant at the time of making them was acting either under coercion or persuasion; that she had been induced to make these confessions in the hope of not receiving capital punishment; that such promise was made to her by the officers through the witness, Dr. T. H. Beaird; that the sheriff feared mob violence at the time the grand jury were in session and asked the Governor for Rangers, and that these were sent; that the defendant was in distress from various causes and feared arrest; that some time before she went to the grand jury, she had seen some negroes who were at the scene of the homicide with ropes around their necks to force from them a confession, on account of their presence on the premises on the night of the homicide, etc.

The defendant made several confessions before the grand jury, two of which were introduced in evidence by the State. In one of

these confessions the defendant, among other things, stated that the lamp was not burning in the house where the shooting occurred when the shot was fired; that the shot awakened her and she looked and saw a man run out at the kitchen door, saying, "Damn you, I told you I would kill you"; that she would not say that she recognized the voice; that she thought it was the voice of Ed Beaird; that she could not swear that it was his, but believed it was. Further on in said confession she stated that she desired to change this portion of her statement and to say now that it was Ed Beaird who fired the shot and that she saw him; that there was a light in the room and the party holding the light was standing so that the door was between defendant and the party holding the light, and that she could not see who was holding the light; that Ed Beaird was standing at the foot of her bed when he fired the shot and that the gun was only a few feet from deceased when it fired.

In the other and last confession the defendant stated that the only persons who knew about the murder of her husband that she knew of were herself, Ed Beaird and Joe Dorsey; that they were all three in the room when the shooting occurred; that Joe Dorsey fired the shot and Ed Beaird held the light; that defendant was in bed; that her husband was asleep when he was shot; that Joe Dorsey stood at the foot of her bed when he fired the shot; that defendant's husband had been intimate with Beaird's wife, and that the defendant had been intimate with Beaird; that they had started it as a joke; that Ed Beaird and defendant had had carnal intercourse, and that Ed Beaird told defendant he was going to quit his wife when his crop was laid by, and he wanted defendant to run off with him; that defendant never said whether she would do so or not; that Ed Beaird told defendant he was mad the way deceased had done, and he also wanted her to go off with him; that Ed Beaird told defendant about one or two weeks before the shooting that he was going to kill deceased; that defendant thought he had two reasons for killing him, one was because deceased had been intimate with Ed Beaird's wife, and the other was Ed Beaird wanted defendant to go off with him; that Ed Beaird said he was going to leave his wife; that the plan for the killing was made up in the front yard; that Ed Beaird had told defendant he was going to get one of the negroes to help him; that defendant heard them a day or so before the killing, planning it; that defendant was in the side room; that Ed Beaird said to Joe Dorsey he wanted him to kill deceased and he would pay him to do it, and he didn't think he would get into it, and he didn't think defendant would tell of it at all; that Ed Beaird had said to defendant he was going to kill deceased and it would be to defendant's interest not to tell; that defendant told Ed Beaird not to, but he said he was going to, and that she told him if he wouldn't listen to her to go ahead; that Ed Beaird told Joe Dorsey, the plan was to shoot

deceased while he was asleep and then throw the gun in the tank, and also to ride a horse so it would appear like someone had been there on a horse; that one of them said they would have to tell about two men coming there the night before and having a racket with deceased; that defendant was rather expecting the killing that night, because Joe Dorsey left his shoes in the kitchen and came in to get them after he had gone to bed; that Dorsey spoke to the deceased and said he wanted to come in and get his shoes, that this was she supposed to get into the kitchen door; that she awakened about the time the shot fired; that she saw the gun fire; that she had been asleep; that she saw them both distinctly; that Ed Beaird said, "Damn you, I told you I would kill you," and that she, defendant, jumped up and said, "My God, Ed, what have you done?" and he replied, "Hush, I'll turn it on you"; that Ed Beaird and Joe Dorsey both went out of the kitchen door and Joe Dorsey went around the house with the gun, and Ed Beaird went up towards home; that one of them rode a horse around about the front of the house and then down the road, that she didn't know which one it was; that defendant called the negroes in the cabin, and by the time they came out "We went in the house and lit the lamp, and Joe came in the house and said he wanted to see how bad he was hurt;" that defendant hollered and told the negroes that deceased was badly hurt; that they sent Joe Dorsey up to Mr. Beaird's to phone for Price Harris and Dr. Smith; that Ed Beaird was the first one there, and then Price, Harris and Mr. Sadler next; that defendant supposed that Joe Dorsey had a gun, from what he said, that she didn't know where he got the gun, she supposed it was on the outside for he said something about it getting rusty; that defendant heard Ed Beaird tell Joe Dorsey he wanted him to get a gun and do the killing, and Joe Dorsey agreed to do so; that defendant was jealous of her husband's relations with Mrs. Beaird, and that this was one reason why defendant didn't care very much about her husband's death; that while defendant never told Ed Beaird she would go with him, she felt sure he believed it, for she had encouraged him and knew that he loved her; that he had made love to her.

Among other things the State's testimony further showed by the deputy sheriff of Limestone County that he was called by Ed Beaird about eleven o'clock of the night of the killing over the phone, telling the officer that the deceased had been shot and that his wife had just sent after Beaird and requested him to telephone to the officer to come, and that he (the officer) immediately started down to the scene of the killing which was something like half a mile from the officer's house and that Lon Sadler went with him; that when they got to the house they found there Ed Beaird, the defendant, Joe Dorsey and three of the negroes, they were all standing in the yard back of the kitchen, and defendant was crying and said that someone had slipped in and killed her husband, that she had not been in the room

and did not know how badly he was hurt; that the officer and his companion went into the room and found deceased lying on the folding bed with his head towards the foot of the bed, shot in the forehead with a gun which made a hole about the size of a silver dollar, that he was lying four or five feet on the foot of the other bed in the room; that the deceased never moved after witness got there and died a little after twelve o'clock; that the officer talked to the defendant asking her about the killing, and she stated, among other things, that two parties came there the night before and that they had had a fight with the deceased; that she did not know who they were and that the deceased said he had trouble but refused to tell her about it, and that the parties had had the fight about eleven o'clock at night, and that she separated them; that deceased called one of them "Bob," that she tried to get her husband to tell her what it was about, but he refused; that defendant said to the officer that she did not know who killed her husband, and that she was asleep when the gun was fired and it awakened her; that she saw a man run out of the house at the kitchen door, but could not tell whether it was a white man or not; and also said that the lamp was not burning.

That early the next morning the officer and his party discovered horse tracks in the yard, and that the tracks entered the premises at the front gate and went down the edge of the turning row to about eighteen feet of the house and then turned near the cistern and went back to the gate down the first cotton row; that these tracks led into the public road; that they were made by a horse that was shod all around, that the sheriff led Ed Beaird's horse out in the cotton by these tracks and made a comparison, but the officer did not notice whether or not they fitted, etc.

The State further showed that defendant was very fond of Ed Beaird and had often been seen in company with him just before the killing, and had repeated conversations with Beaird and was seen alone with him on several occasions, and acts of undue familiarity had been seen between them; that defendant and Beaird were seen in private conversation after the killing, and also after the burial of deceased; that a double barreled breech loading shotgun was found in a tank or pool near the home of the defendant; that defendant had some indecent conversation with a party about having her husband castrated about a month before he was killed; that defendant's little seven year old son made an incriminating remark in the presence of defendant about the gun and Joe Dorsey, and that defendant did not make a prompt and proper denial; that defendant appeared unconcerned about her husband's death, and did not go into the room after he was shot, etc.

Defendant's special requested instruction number two charged the jury that if they believed from the evidence beyond a reasonable

doubt that said confessions were made by the defendant freely and voluntarily and of her own free will and accord, and so signed by her without any inducement or fear of punishment from anyone or any hope of reward from anyone, then they might consider said confessions in connection with all the other facts and circumstances of the case. But if the jury believed that said confessions were induced either from fear of Dr. J. H. Beaird or from a promise of some temporary good to her coming to her from said Dr. Beaird through the county attorney of Limestone County, or if they believed that she was in such terror and condition of mind and body as that such confessions were not voluntary in the sense that defendant's mind and will did not freely and voluntarily act in the making of said confessions, then the jury could not consider said confessions for any purpose. And if the jury should consider the confessions then they must consider them as written and signed, and if they are so contradictory in themselves that they could not be reconciled then they might discard them from their consideration in arriving at a verdict in the case.

The opinion states the case.

*H. D. Wood,* and *Harper, Jackson & Harper,* and *M. W. Herring,* and *Tom M. Hamilton,* for appellant.—On question of inspecting public document in advance of trial: Jenkins v. State, 45 Texas Crim. Rep., 173. On question of election by State: Cases cited in opinion. On question of requiring State to place eyewitness on stand: Yancy v. State, 48 Texas Crim. Rep., 166, 87 S. W. Rep., 693; McCandless v. State, 42 Texas Crim. Rep., 58, 655, 2 Texas Ct. Rep., 492; Thompson v. State, 30 Texas Crim. App., 325. On question of continuance: Rucker v. State, 7 Texas Crim. App., 549; Hyde v. State, 16 Texas, 446; Attaway v. State, 31 Texas Crim. Rep., 475. On court's charge on principals and failure to submit defendant's requested charge: Dunman v. State, 1 Texas Crim. App., 593; Ripley v. State, 19 Ct. Rep., 49; Cabrera v. State, 53 Texas Crim. Rep., 466, 118 S. W. Rep., 1054. On question of conspiracy: Surrell v. State, 29 Texas Crim. App., 321; Nalley v. State, 30 Texas Crim. App., 456; Jones v. State, 35 Texas Crim. Rep., 565; Wheeler v. State, 34 Texas Crim. Rep., 350; Black v. State, 38 Texas Crim. Rep., 58; Wallace v. State, 48 Texas Crim. Rep., 318, 13 Texas Ct. Rep., 612. On question of court's charge on confessions: Thomas v. State, 35 Texas Crim. Rep., 178; Gallaher v. State, 40 Texas Crim. Rep., 296, 50 S. W. Rep., 388. On question of exhibiting transcript of change of venue before jury: Moore v. State, 46 Texas Crim. Rep., 54, 10 Texas Ct. Rep., 26; and cases cited in opinion. On question of introducing testimony on general reputation of State's witness for truth and veracity: Hill v. State, 52 Texas Crim. Rep., 241; Jones v. State, 52 Texas Crim. Rep., 206. On question of refusing defendant's requested charge on confessions: Layton v. State, 52 Texas Crim. Rep., 513; Buckner v.

State, 52 Texas Crim. Rep., 271; Jones v. State, 52 Texas Crim. Rep., 206; Spicer v. State, 52 Texas Crim. Rep., 177; Parker v. State, 46 Texas Crim. Rep., 461; Gallaher v. State, 40 Texas Crim. Rep., 296; Bailey v. State, 40 Texas Crim. Rep., 150; Searcy v. State, 28 Texas Crim. App., 513; Neely v. State, 27 Texas Crim. App., 324.

*F. J. McCord,* Assistant Attorney-General, *L. A. Johnson,* District Attorney, *Pat M. Neff,* County Attorney, McLennan Co., and *Tom Connally,* for the State.——Cases cited in opinion.

RAMSEY, JUDGE.—Appellant was indicted in the District Court of Limestone County charged with the murder of her husband, Tilden Goode. On application the venue was soon thereafter changed to McLennan County. The trial of the case began in the last named county on October 27, 1908, and resulted in a verdict finding appellant guilty of murder in the second degree and assessing her punishment at confinement in the penitentiary for twenty-five years.

We deem it unnecessary to make a detailed statement of the facts. The evidence shows that appellant and Tilden Goode, her husband, were living on a rented farm near the village of Ben Hur in Limestone County at the date of his death, which occurred June 25, 1908, on the night of which day between 10 and 11 o'clock he was killed while lying in his bed, death resulting from a gunshot wound. One Ed Beaird, who lived some 400 yards from the Goode place, was likewise a tenant of A. T. Derden, who owned both places or the place on which they both at the time resided. Living with appellant and her husband was one Joe Dorsey, a negro, who slept in a little side room partitioned off on the east end of the front gallery. It was the theory of the State that Mrs. Goode, appellant, and Ed Beaird had been for some time criminally intimate, and that she manifested a fondness for and intimacy with Joe Dorsey, the negro, not in harmony with the conduct which should be expected from a white woman, and that the motive of the killing was the wish of appellant and Beaird to free themselves of the presence of the deceased in order that they might enjoy each other's society unmolested and be freer to leave the country. There was considerable evidence aside from the confession of Mrs. Goode that this condition of affairs and this wish existed. It was the contention of appellant's counsel that Mrs. Goode was blameless in the matter, and they suggest that the killing was done by or through the procurement of one Dr. T. H. Beaird. A great number of questions are raised on the appeal, most of which are presented in an able and well considered brief filed in appellant's behalf. We will discuss such of them as we think demand treatment and attention.

1. The first error assigned by appellant is the overruling of a motion made by her to compel State's counsel to deliver to her and

her counsel what they termed a purported confession or declaration made by her touching the manner of her husband's death and her complicity therein. These confessions were on the trial introduced in evidence, and were in all respects executed and witnessed in accordance with the Act of the Thirtieth Legislature touching this character of document. Appellant relies, in support of this motion, on the case of Jenkins v. State, 45 Texas Crim. Rep., 173. We do not think that this confession was in any sense a public document and, therefore, open to the inspection of appellant's counsel in advance of the trial. Articles 941 and 942 of the Code of Criminal Procedure are as follows:

Article 941: "When a justice of the peace has good cause to believe that an offense has been, or is about to be committed against the laws of this State, he may summon and examine any witness or witnesses, in relation thereto; and if it shall appear from the statement of any witness or witnesses that an offense has been committed, the justice shall reduce said statements to writing, and cause the same to be sworn to by the witness or witnesses making the same, and thereupon such justice shall issue a warrant for the arrest of the offender, the same as if complaint had been made out and filed against each offender."

Article 942: "Witnesses summoned under the preceding article who shall refuse to appear and make a statement of facts under oath, shall be guilty of a contempt of court, and may be fined not exceeding one hundred dollars, and may be attached and imprisoned until they make such statement."

Such proceedings, it is held, are public documents, and on proper motion a defendant has the right to inspect and use it as evidence if he deems it necessary. These provisions of our Code of Criminal Procedure, however, have no reference to a confession such as was here sought to be examined. It was a part of the proceedings of the grand jury and for that reason subject to the seal of secrecy until and unless offered as a criminating circumstance or testimony against appellant. Besides, if, in any event, this motion had any merit in respect to same, the error was cured by the fact that both confessions were in fact turned over to counsel for their examination. Again, it does not appear, nor does the motion recite, that either she or her counsel were ignorant of the nature of the confessions or the contents of the statements. Having given them presumably, she must have known the substance of their contents, and having an opportunity to inspect them on the trial, with no suggestion or claim, as shown by the record, that improper limitations either as to time or opportunity were laid upon her or her counsel in respect thereto, it cannot, we think, be held that any error in respect to this matter was committed by which she could possibly have been prejudiced.

2. Again, appellant complains of the action of the court in overruling motion to quash the certified copy of the indictment served

upon her and to suspend the trial until she could be served with a certified copy of the indictment against her as by law provided. In approving the bill of exceptions touching this matter, the court makes this statement: "The original indictment and the copy served on the defendant were identical in every particular, and at the time objection was made a careful comparison was made between the indictment and the copy and no variance between them could be discovered, and defendant's counsel, after being requested by the court to point out the variance, if any, refused to do so." This is an unequivocal finding of fact as we understand that there was no variance, and the record so appearing appellant is without any ground of complaint as to this matter. Again, we call attention to the fact that under article 617 of the Code of Criminal Procedure it is doubtful if this motion in any· event should have been sustained. This article is as follows: "An application for a change of venue may be heard and determined before either party has announced ready for trial, but in all cases before a change of venue is ordered, all motions to set aside the indictment and all special pleas and exceptions which are to be determined by the judge, and which have been filed, shall be disposed of by the court, and if overruled the plea of not guilty entered." In construing this article our court has more than once said that it was contemplated by the above article that all questions relating to the form of indictment and those not relating to the substance of the charge, which defendant may desire to make, must be heard by him before he makes his application for change of venue, and all that is left to be done thereafter in the court to which the case is removed, is to try the issue joined upon a plea of not guilty, and pronounce judgment thereon according to law. Caldwell v. State, 41 Texas, 86; Loggins v. State, 8 Texas Crim. App., 434; Barr v. State, 16 Texas Crim. App., 333; Vance v. State, 32 Texas Crim. Rep., 396.

3. Complaint is also made of the refusal of the court to require the State to elect between the counts in the indictment before the evidence was closed. The rule is well settled that where an indictment charges in separate counts one or more distinct felonies and the evidence adduced develops distinct transactions, the State should, at the request of the defendant, be forced to elect upon which count or transaction it will prosecute. Such were the cases cited by appellant in McKenzie v. State, 32 Texas Crim. Rep., 568, and Blackwell v. State, 30 Texas Crim. Rep., 672. This rule, however, has no application to a case like the one at bar, where only one criminal transaction or act is charged and different counts are contained or inserted in the indictment drawn to meet the possible phases that the testimony may assume. The distinction is thus stated in the case of Moore v. State, 37 Texas Crim. Rep., 552, 40 S. W. Rep., 287: "We understand the rule to be that the indictment can charge the same offense or transaction in any number of distinct counts, and in

such case the State will not be driven to an election. If distinct offenses are charged in different counts in the same indictment, the State may be required to elect. See Pisano v. State, 34 Texas Crim. Rep., 62, 29 S. W. Rep., 42. If the same transaction or offense is charged in different counts, each count alleging a different mode or means of doing the same act constituting the offense, the State will not be required ordinarily to elect." Smith v. State, 34 Texas Crim. Rep., 123; Willis v. State, 34 Texas Crim. Rep., 148; Dill v. State, 35 Texas Crim. Rep., 240, 33 S. W. Rep., 126; Shuman v. State, 34 Texas Crim. Rep., 69. See also Parks v. State, 46 Texas Crim. Rep., 100, 79 S. W. Rep., 301.

4. Appellant also assigns as error the refusal of the court to require the State to place Joe Dorsey, whom appellant alleged to be an eyewitness to the killing, on the stand. This motion alleges that Dorsey was an eyewitness to the killing, and the testimony of the State indicated clearly that he was a party to the criminal conspiracy to kill deceased. The motion itself showed he was in jail, and it would indeed have been a singular rule to require the State to place upon the witness stand a co-conspirator to be bound by his testimony. We do not understand the law to be that a defendant has of necessity the right to select the testimony that the State shall offer against him, but that the State may exercise within reasonable limits its own discretion. In the recent case of Lard v. State, 54 Texas Crim. Rep., 570, 113 S. W. Rep., 762, Judge Brooks, speaking for the court used this language: "The State cannot be forced to introduce any particular witness in the proof of its case." If it could ever be held that this was too broad a statement of the rule, we do not think it true in respect to a person such as Dorsey is shown to be in this case, or that it ought ever to be held mandatory on the State at the mere suggestion of defendant to be compelled to place such witness on the stand. The following authorities, we think, hold adversely to appellant's contention: Yancy v. State, 48 Texas Crim. Rep., 166, 87 S. W. Rep., 693; McCandless v. State, 42 Texas Crim. Rep., 58, 655, 2 Ct. Rep., 492; Kidwell v. State, 35 Texas Crim. Rep., 264; Mayes v. State, 33 Texas Crim. Rep., 33; Darter v. State, 39 Texas Crim. Rep., 40; Reyons v. State, 33 Texas Crim. Rep., 143.

5. The next assignment of error complains of the action of the court in overruling appellant's plea to the jurisdiction of the District Court of McLennan County. This motion was based on the ground, in substance, that the certified transcript of the orders of the District Court of Limestone County did not contain a certified copy of the indictment against her. This was not required. Article 622 of the Code of Criminal Procedure is as follows: "When an order for a change of venue has been made, the clerk of the court where the prosecution is pending shall make out a true transcript of all the

*orders* made in the cause, and certify thereto under his official seal, and shall transmit the same, together with all the *original papers* in the case, to the clerk of the court to which the venue has been changed." In allowing the bill of exceptions touching this matter the court certifies that the original indictment accompanied the transcript and was on file with it. This was all that the law requires, and appellant was without any cause of complaint. Besides, appellant could not question the jurisdiction of the court as attempted here, for the reason that there is no exception in the record to the original order changing the venue in the District Court of Limestone County. The court of that county having granted the order, the jurisdiction of the District Court of McLennan County to try the case could not be attacked for irregularities or errors committed in the court of the first named county. It appears, too, in this case, not only that appellant did not object to the change of venue, but same seems to have been granted at her request, at least the order granting the change of venue so recites. Bohannan v. State, 14 Texas Crim. App., 271; Harrison v. State, 3 Texas Crim. App., 558; Preston v. State, 4 Texas Crim. App., 186; Brown v. State, 6 Texas Crim. App., 286; Rothschild v. State, 7 Texas Crim. App., 519; Krebs v. State, 8 Texas Crim. App., 1; Ex parte Cock, 7 Texas Crim. App., 659. The motion in respect to this matter also complains that the transcript on change of venue did not show that appellant had pleaded not guilty, and also complains that it did not show that she had been arraigned on said indictment in Limestone County. The order changing the venue contained in the record recites that appellant had pleaded not guilty, and this order was certified by the clerk of the District Court of Limestone County. Even if the record had been silent on these matters, under the authority of Caldwell v. State, 41 Texas, 86, there would have been no error. The opinion in that case, delivered by Judge Roberts, includes a full and satisfactory discussion of this question, and holds, in terms, that the omission of the court to have the defendant arraigned before a change of venue, constitutes no ground for a new trial.

6. The next matter urged as grounds for reversal is the action of the court in overruling appellant's application for a continuance. This application was based on the absence and for the want of the testimony of the following witnesses: D. Isadore, T. H. Hays, Mrs. Price Harris, Will Robinson, Lee Franklin, Mrs. Jacob Wolf, Mrs. Sam Dougherty, Mrs. Irwin and Mrs. Rutherford. The court appends the following explanation to the bill of exceptions: "That Mrs. Price Harris, one of the witnesses, was afterwards in attendance and testified though not present at time of motion that Hays had never been subpoenaed, but court offered to have attachment issued for him and have him brought to court, but defendant's counsel declined to insist on his attendance, and that D. Isadore was a witness

for and had been subpoenaed as a witness for the State, and the State had attempted to locate his whereabouts in order to have him brought to court, but could not do so, and that during the trial officers searched for witness and could not locate him, though searched for him in different counties, and his wife testified that she had not seen him for several weeks and did not know where he was." There was no error in overruling the application for continuance, and for many reasons. In the first place, the allegation in respect to diligence was in this language: "For diligence in this behalf, defendant shows to the court that she made applications for, and had process issued from the District Court of ............ County, and placed the same in the hands of the sheriff of ............ County, on the ...... day of .........., 1908.

"And this is true as to all witnesses named herein, except as to the witness T. H. Hays, but the defendant here now offers to the court John T. Prichard to prove the actual service of a subpoena on said witness T. H. Hays and the return thereon. The process as to this witness being either lost, mislaid, or not transmitted to this court by the clerk of the District Court of Limestone County. All of which process is attached hereto and asked to be taken and considered as a part of this application." It thus does not appear in the face of the application when the process was issued or from what court. We cannot assume in aid of the application any fact not in substance, at least, stated in it. Again, the application was fatally defective in this: It was a second application for continuance. It omitted to contain the statutory averment "that the testimony cannot be procured from any other source" and it also failed to aver "that the defendant has reasonable expectation of procuring the same at the next term of the court." The contention was made, however, that this application should not be tested by the rules that ordinarily apply in respect to a second application for continuance, for the reason that it was averred this was appellant's first application for continuance based upon the absence of witnesses, the first application having been made while the case was pending in Limestone County and based on the fact of appellant's sickness alone. This contention is unsound. In the case of McKinney v. State, 8 Texas Crim. App., 626, it was held that where a continuance has been entered up by the parties by consent, another application thereafter is a second or subsequent application and should conform to the requirements of second applications. It has also been uniformly held that nothing will be presumed in aid of a second application for continuance. Henderson v. State, 5 Texas Crim. App., 134. And that strict compliance with all the requirements of the statute is essential to its sufficiency. Barrett v. State, 9 Texas Crim. App., 33. And that the diligence to procure the absent testimony must be shown, and the diligence thus shown must not be insufficient. Laurence v. State, 31

Texas Crim. Rep., 601. It is, of course, a well settled rule that a second application for continuance will not be granted for testimony which would be only cumulative, and that the granting or refusal of subsequent applications for continuance has always been a matter discretionary with the court. Myers v. State, 7 Texas Crim. App., 640; Johnson v. State, 7 Texas Crim. App., 297; Krebs v. State, 8 Texas Crim. App., 1.

7. The next assignment which we think it worth while to notice complains of the action of the court in admitting evidence as to the intimacy of appellant with Ed Beaird and Joe Dorsey. In the light of all the testimony, broadly considered, in connection with appellant's confession, this testimony is clearly admissible as showing motive for the assassination as well as indicating a condition of affairs and intimacy out of which such conspiracy might have arisen. It is always competent, in a case of this character, where a conspiracy is charged, to show familiarity, acquaintance, common motive and incentive between the conspirators charged.

8. The most important question raised on the appeal relates to the action of the court in refusing to give in charge the first special instruction requested by counsel for appellant. This charge is as follows: "The mere presence of a party at the commission of an offense does not make him a principal, and mere knowledge that an offense is about to be committed, will not make the party a principal; nor will his knowledge that an offense is being committed or has been committed nor will his failure to give alarm his silence, inaction, or supposed concealment of the offense and the offenders make him a principal.

"To constitute one a principal with others in the commission of a crime there must be a combination of both acts and intent. He must act together with others in the commission of the offense, knowing their unlawful intent.

"Now, therefore, unless you believe from the evidence beyond a reasonable doubt that Pearl Goode was present at the time Tilden Goode was killed and that she knew both of the act of the killing and of the intent of the person that killed him, and unless you believe from the evidence beyond a reasonable doubt that she did some overt act in connection with the party or parties who did kill and murder Tilden Goode whoever they may be, and that she had a guilty knowledge and had conspired and confederated with the party or parties who did kill Tilden Goode before the act was done, then her bare presence at the home of her husband on the night of the killing and the mere fact that she may have falsified about the killing and the further fact that she may have concealed the offenders who did kill him, then you could not convict her as a principal offender in this crime."

In considering this charge we should, of course, do so in the light

of the general charge of the court. Articles 74, 75 and 76 of our Penal Code, defining principals as known to our law, are in these words:

Article 74: "All persons are principals who are guilty of acting together in the commission of an offense."

Article 75: "When an offense is actually committed by one or more persons, but others are present, and knowing the unlawful intent, aid by acts, or encourage by words or gestures, those actually engaged in the commission of the unlawful act; or who, not being actually present, keep watch so as to prevent the interruption of those engaged in committing the offense, such persons so aiding, encouraging or keeping watch are principal offenders, and may be prosecuted and convicted as such."

Article 76: "All persons who shall engage in procuring aid, arms or means of any kind to assist in the commission of an offense while others are executing the unlawful act, and all persons who endeavor at the time of the commission of the offense to secure the safety or concealment of the offenders, are principals and may be convicted and punished as such."

In the general charge of the court, the jury, in respect to the issue of principals, were thus instructed:

"All persons are principals who are guilty of acting together in the commission of an offense. When an offense is actually committed by one or more persons, but others are present and, knowing the unlawful intent, aid by acts or encourage by words or gestures those actually engaged in the commission of the unlawful act, such persons so aiding and encouraging are principal offenders, and may be prosecuted as such.

"And all persons who endeavor at the time of the commission of the offense to secure the safety or concealment of the offenders are principals and may be convicted and punished as such. And any person who advises or agrees to the commission of an offense, and who is present when the same is committed is a principal thereto whether he aids or not in the illegal act.

"If you believe from the evidence that the said Pearl Goode did not shoot and kill Tilden Goode as charged in the indictment, but you further believe from the evidence beyond a reasonable doubt that on the date charged in the indictment in the county of Limestone and State of Texas the said Joe Dorsey or Ed Beaird or anyone else shot and killed said Tilden Goode with a gun, and if you further believe from the evidence beyond a reasonable doubt that the said Pearl Goode was present at the time of said shooting (if any) and knowing the unlawful intent, aided by acts or encouraged by words or gestures those actually engaged in said shooting, if any; or if you believe from the evidence beyond a reasonable doubt that the said Pearl Goode advised or agreed to the shooting and killing of her husband,

the said Tilden Goode (if he was shot and killed), and was present when the same was done, whether she aided or not in said shooting; or, if you further believe beyond a reasonable doubt that the defendant Pearl Goode endeavored at the time of the shooting of Tilden Goode (if he was shot as charged) to secure the safety or concealment of the ones doing the shooting, then, if you so find, she would be a principal and subject to the same punishment under the law as those actually engaged in the shooting and killing of the said Tilden Goode, if he was unlawfully shot and killed."

We think, in the first place, the charge of the court was a sufficient presentation of the law on this subject. If, however, a further presentation of the matter was desired, it is not believed that the charge requested ought in any event to have been given. The concluding part of the charge: "and the further fact that she may have concealed the offenders who did kill him" is eliminated as an element of the law of principals. This is in the face of the provisions of the Penal Code which provides, among other things, that "all persons who shall engage in procuring aid, arms or means of any kind to assist in the commission of an offense while others are executing the unlawful act, and all persons who endeavor at the time of the commission of the offense to secure the safety or concealment of the offenders are principals, and may· be convicted and punished as such." Again, the charge requested is vicious in that if theretofore she had consented and agreed upon the murder and was present when it was committed, she could and should be held guilty as a principal, though at the moment of the killing she did no overt act. In other respects the charge requested was erroneous, a charge on the weight of evidence, and while it enunciated in some respects correct legal principles, so far as applicable, we think the matter was covered by the court's general charge.

9. The next error is with reference to the refusal of the court to give in charge to the jury the second special instruction requested by appellant's counsel, to the effect, in substance, that unless the jury should believe that the confessions offered in evidence were freely and voluntarily made without any inducement or fear of punishment from anyone, they would not consider such confessions in evidence for any purpose. On this subject the court, in his general charge to the jury, instructed them as follows:

"The State has introduced in evidence before you two papers alleged to be and purporting to be statements or confessions of the said ·Pearl Goode made by her before the grand jury of Limestone County, Texas.

"You are instructed that the confessions of a defendant may be used in evidence against her if it appear that the same were freely made and without compulsion or persuasion.

"Now, if you believe from the evidence in this case that such

confessions or either of them were not freely and voluntarily made or if you have a reasonable doubt thereof or if you believe that said confessions or either of them were induced by force, threats or coercion or any other improper influence or if you have a reasonable doubt thereof then you should wholly disregard said confession or confessions made under such circumstances and not consider it or them against the defendant.

"You are instructed that a defendant cannot be convicted on a confession alone unless there is other testimony corroborating said confession and tending to connect the defendant with the commission of the crime, and proof of the crime itself is not a sufficient corroboration of the confession. And you are further charged that when confessions of a party are introduced in evidence by the State, then the whole of the admissions or confessions are to be taken together and the State is bound by them unless they are shown by the evidence to be untrue. Such admissions or confessions are to be taken into consideration by the jury as evidence in connection with all the other facts and circumstances of the case, and you will so consider said confession or confessions in this case unless you disregard one or both of them under the charge herein before given you."

This was a correct, and as we believe, a sufficient instruction on this question. The requested instruction was fatally wrong in that it instructed the jury that "if they (the confessions) are so contradicted in themselves, that they cannot be reconciled then you may discard them from your consideration in arriving at a verdict in this case." This was manifestly a charge on the weight of evidence, and ought not to have been given. The fact that the confessions were contradictory within themselves would not affect the admissibility, but would be a circumstance to go to the jury in determining their weight. While there was in this case some contradictions between the confessions, after all, the contradictions, so far as important, consisted mainly in withdrawing certain statements and making others touching the person who really fired the fatal shot. The confessions having been executed in accordance with law, were admissible. The fact that they were contradictory or if the jury believed them confusing, was a matter affecting the weight to be given thereto and did not touch their admissibility.

10. In addition to a very fair and favorable general charge, the court gave special charges Nos. 6 and 7 requested by counsel for appellant. These instructions are as follows:

Special charge No. 6: "A conspiracy is proved either expressly or by proof of facts from which it may be inferred. A conspiracy so far as the defendant on trial is concerned cannot be established from the separate acts and declarations of Joe Dorsey and Ed Beaird. But if you believe from the evidence beyond a reasonable doubt that defendant entered into a conspiracy with Joe Dorsey and Ed Beaird

for the purpose of killing Tilden Goode, and for that purpose only, you may then consider the separate acts and declarations of such co-conspirators done and made while the conspiracy was pending and in furtherance thereof. If you do not believe from the evidence that a conspiracy was entered into by and between Joe Dorsey and Ed Beaird or either of them and defendant for the purpose of taking the life of Tilden Goode, and for no other purpose, or if you have a reasonable doubt that such a conspiracy was entered into, or has been established by the evidence, then you should reject all facts and declarations of such other parties against defendant."

Special charge No. 7: "You cannot consider the acts and declarations of Joe Dorsey and Ed Beaird, or either of them for the purpose of proving a conspiracy, even though you may believe a conspiracy was formed to take the life of Tilden Goode. And the jury must believe beyond a reasonable doubt that a conspiracy was formed, and already existed, between Joe Dorsey and Ed Beaird and defendant, before they can consider the acts or declarations of Joe Dorsey or Ed Beaird as against defendant in this case. And the jury are charged that the acts and declarations of a co-conspirator or accomplice cannot be considered for the purpose of proving the conspiracy itself; but the conspiracy must be proven otherwise than by the acts and declarations of a co-conspirator or accomplice; and beyond a reasonable doubt before you can consider any act or declaration of a co-conspirator or accomplice against defendant.

"And you are further charged that you can only consider an act or declaration of a co-conspirator, after the proof of the conspiracy itself has been first established, for the purpose of throwing light upon, illustrating and making manifest the purpose, object, motive and intent of the parties forming the conspiracy, and not to prove the conspiracy itself." This presents very clearly and in the language chosen by appellant's counsel, her contention touching the matter of conspiracy and her connection with Ed Beaird and Joe Dorsey.

11. Appellant complains that there was error in the action of the court touching the introduction of the transcript changing the venue of the case, and that her cause suffered injury by reason of the display of said transcript before the jury. This matter, as stated by the court, occurred in this way: "Counsel for the State did not display transcript, did not exhibit it to the jury, and only asked the court if it was necessary in order to show jurisdiction that they should offer transcript and asked the court if it was necessary to do this, and the court stated it was not, that the court would take judicial knowledge of that. And that no portion of it was read nor any of its contents read either in the presence or hearing of the jury and that no reference was ever made as to at whose instance the transcript was made, and counsel merely stated that 'if it is necessary to prove jurisdiction' it will be offered. Court said 'No,' and

no further reference was made to it." Assuming, as we must do, that the facts certified by the trial court are correct, the case here presented is wholly unlike the facts in the case of Shamburger v. State, 24 Texas Crim. App., 433. In the Shamburger case it appears that on the trial the State, over defendant's objection, read in evidence to the jury the order of the District Court of Hunt County changing the venue of same. This order recited that there exists such a prejudice against the defendant in Hunt County that he cannot get a fair trial and that there was a combination of influential persons against him in said Hunt County. In passing on this question, Judge Willson, speaking for the court, uses this language: "It was error to admit said order in evidence. It was wholly irrelevant to the issue on trial. It was merely a record of the court showing the jurisdiction of the District Court of Kaufman County over the case. It was not a matter of evidence for the jury, but for the court alone." In the case of Moore v. State, 46 Texas Crim. Rep., 54, 10 Texas Ct. Rep., 26, it appears that the decrees and orders changing the venue were offered to the court alone and, as it seems, not for the benefit of the jury. Objection was made there for the reason that the only effect of the evidence was to prejudice the jury against defendant because the case had been removed. The bill of exceptions in that case was signed with the qualification that the counsel for the State offered the orders and decrees to the court alone, and in a rather undertone of voice, and it was thought by the court that the jury would not have been informed for what purpose the papers were offered if appellant's counsel had not gotten up and stated what these papers were. It is also stated that they were not read before the jury nor in the hearing of the jury. Further discussing the matter, Judge Davidson, who wrote the opinion, uses this language: "Just how far this may or may not have prejudiced appellant we are not able to say, and perhaps it is not necessary to discuss it in this case; but, under the rule in Shamburger's case, 24 Texas Crim. App., 433, these proceedings were not admissible. To say the least of it, this was rather a peculiar proceeding. The court was fully apprised of all the proceedings in regard to the change of venue. The judge who tried the case in Fannin County was the same judge who granted the change of venue and entered up the orders and decrees in Lamar County; and the judgments, decrees, and proceedings had on the change of venue in Lamar County were inadmissible in evidence for any purpose; that the court judicially knew of all these orders and decrees, and the jury were not entitled to know it." The explanation here is that counsel for the State did not display the transcript, did not exhibit it to the jury, and only asked the court if it was necessary in order to show jurisdiction that they should offer the transcript; that the court stated it was not; that he had taken judicial knowledge of that. That it was further distinctly stated that no

portion of it was read in the presence or hearing of the jury, and "no reference was made as to at whose instance the transfer was made." Here it does not appear from anything in the record that the jury had any information from which they could have concluded that the change of venue was sought at the instance of appellant. In the nature of things the jury must have known and would have known that for some reason a change of venue had been granted. No inference from anything said or done to the disadvantage of appellant could have been deduced from the facts shown in evidence.

12. A serious question is made as to the action of the court in allowing the State to prove the good reputation for truth and veracity of one Dr. T. H. Beaird, a witness for the State. The testimony of this witness was important and decidedly adverse to appellant, and if this action of the court was erroneous the case ought to be reversed. We do not believe, however, there was any error in the action of the court touching this matter. As we gather from the cross-examination of this witness, it seems to have been the theory or belief of appellant's counsel that Dr. Beaird had either killed Tilden Goode or had procured it to be done, and in many ways this suggestion in cross-examination is put forward and imputed to the witness in no uncertain language. In addition to this numerous predicates were laid to contradict the witness, and he was attacked in every possible way by interrogation, innuendo, and in almost a direct charge, so as to bring him into disrepute and discredit him. It was further shown that he was a stranger in McLennan County. This question is not a new one in this State. In the case of Harris v. State, 94 S. W. Rep., 227, it was distinctly held, in an elaborate opinion by Judge Davidson that where a witness for the State has been attacked or where his character has been assailed in any manner, the State may introduce evidence to sustain that reputation before the witnesses for the defense have been placed on the stand directly to impeach him. That case in many respects was very much like the case at bar. See also Burrell v. State, 18 Texas, 713; Dixon v. State, 15 Texas Crim. App., 271; Coombes v. State, 17 Texas Crim. App., 258; Thomas v. State, 18 Texas Crim. App., 213; Johnson v. Brown, 51 Texas, 65; Phillips v. State, 19 Texas, 158; Barber v. State, 69 S. W. Rep., 514. In addition to this appellant on the trial introduced two witnesses, J. T. Pritchard and A. J. Harper to contradict Dr. Beaird and thus impeach his testimony.

13. Counsel complain of the action of the court in refusing to permit them to ask the witness Dr. Beaird the question as to whether or not he had been criminally intimate with appellant. It appears from the record that when this question was first asked, that the court excluded it, but subsequently had the witness recalled and told appellant's counsel that they might ask the question. The explanation of the court is in this language: "When witness was

first asked question as to intimacy with defendant court sustained objection, but upon reflection decided court was in error and witness was recalled and defendant's counsel told they could ask the questions along this line and witness would have to answer, but defendant's counsel declined to do so." If the testimony was believed to be important, and when in a timely manner the court was convinced of his error and had the witness recalled, and gave counsel permission to ask the questions with the assurance that answers would be compelled, they should in fairness be held either to proceed to ask the questions or to have waived any error theretofore committed by the court in respect to this matter.

14. Complaint is made of the action of the court in admitting the testimony of one Shriver as to a conversation with Ed Beaird, one of the alleged co-conspirators, touching his intimacy with Mrs. Goode. In explaining this bill the court makes the following explanation: "This testimony was excluded and jury instructed to disregard same and not consider it both verbally and in writing." If this testimony was the only evidence touching the relations between appellant and Beaird it might be held that, notwithstanding its final exclusion, it was so hurtful as to constitute serious error, but in the light of the great mass of evidence tending to show their intimacy, and in view of the confessed intimacy of appellant, it is not believed that this was a matter so serious as in any event to operate as a ground of reversal.

We have not written on all the questions raised by appellant, which are very numerous. The record is a very large one, and every conceivable point and question that could be raised was taken advantage of by appellant through her learned counsel, and preserved by bill of exceptions or urged on proper motion. It will be impossible, within the limits of any opinion that we ought to be called on to write, to notice all these matters. We have, however, with the utmost care considered them all and gone over them in the light of the record. We do not believe that any error was committed of such gravity as ought to justify us in reversing the judgment of conviction. If the testimony of the State is to be believed, and if, as the jury evidently found, the confession of appellant was voluntary, then she was a party to one of the most horrible murders ever perpetrated in this State, and we would be recreant to every duty which the law imposes on us if we would place our judgment against that of a jury who heard the evidence, and the action of the court who also having heard it had declined to interfere.

Finding no error in the record, the judgment is hereby affirmed.

*Affirmed.*

[Rehearing denied December 22, 1909.—Reporter.]