## JEFF WHITE v. THE STATE.

No. 4725.    Decided November 28, 1917.

**1.—Occupation—Intoxicating Liquors—Indictment—Limitation.**

Where, upon trial of following the occupation of selling intoxicating liquors in prohibited territory, the indictment followed approved precedent, the same was sufficient, and was preferred within the period of limitation.

**2.—Same—Sufficiency of the Evidence.**

Where, upon trial of following the occupation and business of selling intoxicating liquors in prohibited territory, the evidence sustaining conviction, there was no reversible error.

**3.—Same—Evidence—Internal Revenue License.**

Where, upon trial of following the occupation of selling intoxicating liquors, etc., the State introduced an examined copy of the internal revenue license issued to defendant, there was no reversible error. Following Novy v. State, 62 Texas Crim. Rep., 492, and other cases.

**4.—Same—Continuance—Impeachment—Practice on Appeal.**

Where the alleged absent testimony was either inadmissible or could only have been used for impeachment purposes, the application for continuance was correctly overruled; besides, the diligence was insufficient. Following Trinkle v. State, 59 Texas Crim. Rep., 257, and other cases.

**5.—Same—Argument of Counsel—Bootlegging.**

Where, upon trial of following the occupation of selling intoxicating liquors, etc., there was evidence about bootlegging, there was no reversible error in State counsel's argument in discussing this evidence.

**6.—Same—Evidence—General Reputation—Charge of Court.**

Upon trial of following the occupation of selling intoxicating liquors, etc., there was no error in permitting testimony that the reputation of defendant in the community in which he lived was that of a man that deals in and sells intoxicating liquor, as defendant pleaded for a suspended sentence, which was properly limited by the court; besides, other like testimony was admitted without objection. Following Williamson v. State, 74 Texas Crim. Rep., 289, and other cases.

**7.—Same—Evidence—Contradicting Witness.**

Where a witness for the State was assailed by many questions attacking his credibility there was no error in admitting testimony with reference to witness' reputation, and that he did not stand well with the bootleggers. Following Goode v. State, 57 Texas Crim. Rep., 220, and other cases.

**8.—Same—Charge of Court.**

Where, upon the trial of following the occupation, etc., the court gave a full charge, there was no error in refusing other requested charges, which were either not applicable to the facts or were not presented to the judge at the proper time.

**9.—Same—Misconduct of Jury—Misconduct of Officer.**

Where, upon an appeal from a conviction of following the occupation of selling intoxicating liquors, etc., appellant claimed the misconduct of the deputy sheriff, who was in charge of the jury, and also misconduct of the jury, and the record showed that the trial court heard evidence upon the motion for new trial upon this question and thereupon overruled the motion, his action will not be disturbed. Following Lamb v. State, 75 Texas Crim. Rep., 75, and other cases.

Appeal from the District Court of Gregg. Tried below before the Hon. Daniel Walker.

Appeal from a conviction of following the occupation of selling intoxicating liquors in prohibited territory; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Riley Strickland* and *Young & Stinchcomb,* for the appellant.—On question of insufficiency of the evidence: Oliver v. State, 68 Texas Crim. Rep., 41, 152 S. W. Rep., 1066; Malthrop v. State, 66 Texas

Crim. Rep., 545, 147 S. W. Rep., 1159; Whitehead v. State, 66 Texas Crim. Rep., 482, 147 S. W. Rep., 583; Thomas v. State, 66 Texas Crim. Rep., 374, 147 S. W. Rep., 262.

On question of charge of the court: Ray v. State, 71 Texas Crim. Rep., 268, 158 S. W. Rep., 807; Burrus v. State, 76 Texas Crim. Rep., 120, 172 S. W. Rep., 981.

On misconduct of jury: Blocker v. State, 61 S. W. Rep., 391; Williamson v. State, 62 Texas Crim. Rep., 32, 136 S. W. Rep., 1071; Coleman v. State, 73 Texas Crim. Rep., 255, 170 S. W. Rep., 150; Rigsby v. State, 64 Texas Crim. Rep., 51, 142 S. W. Rep., 901.

*E. B. Hendricks,* Assistant Attorney General, for the State.—On question of internal revenue license: Biddy v. State, 52 Texas Crim. Rep., 414.

On question of argument of counsel: Zimmer v. State, 64 Texas Crim. Rep., 114.

PRENDERGAST, Judge.—Appellant was convicted of pursuing the business or occupation of selling intoxicating liquors in prohibited territory and his punishment assessed at the lowest prescribed by law.

The indictment was duly preferred by the grand jury on May 3, 1917, alleging the offense to have been committed on or about December 20, 1916, "and anterior to the presentment of this indictment," and that in the pursuance of said business appellant did unlawfully sell intoxicating liquors to D. C. Philpot on or about December 20, 1916, and to J. A. D'Orsay on January 14, 1917. Of course, the indictment embraced the period from the time it was preferred, May 3, 1917, back within the period of limitation, three years.

The State proved that prohibition was in force in Gregg County from February, 1903, by the proper orders of the Commissioners Court and the due publication thereof by the county judge.

Mr. Stuckler, the agent of the Wells-Fargo Express Company at Longview, testified that appellant received from that company at Longview intoxicating liquors as follows: January 1, 1916, 12 quarts of whisky; March 4, 4 quarts; March 6, 6 quarts; March 31, 6 quarts; July 14, 12 pints; August 15, 36 pints of beer; August 29, 36 pints of beer; September 6, 4 quarts whisky; October 5, 4 quarts; October 28, 6 quarts; November 15, 6 quarts; January 26, 1917, 8 pints; March 14, 1 gallon wine; March 21, 4 quarts whisky. The evidence does not disclose how much other intoxicating liquors, if any, appellant received from other sources during said period.

D. C. Philpot swore that he bought a pint of whisky from appellant about December 20, 1916, and paid him one dollar therefor.

J. A. D'Orsay swore that on January 13, 1917, he bought one bottle of whisky from appellant; that on January 14 he bought another; that on January 24 he bought another; that on January 25 he bought another; that on January 26 he bought another; that he paid for every

bottle he bought from him and that all this was in Gregg County. This made five separate and distinct sales by appellant to D'Orsay of intoxicating liquor, whisky. D'Orsay further swore that either on the first or second occasion when he bought a bottle of whisky from appellant, that appellant said that when he got whisky he got it to sell and not to drink and that he had to be careful whom he sold it to.

G. E. Knox swore that in January, 1917, he bought a pint of whisky from appellant and paid him a dollar for it. He further swore: "I got whisky from him more than once, but I do not remember the times. . . . All I ever got from him was for other people. I didn't have any money to buy for myself. The reason I got it was that I would get a drink out of it. That's the way I got my drink. I have gotten from Mr. White (appellant) three or four pints, I guess, or five; I don't know how much. I don't know how long he has been selling whisky, but some time last fall and winter. . . . I would get whisky from him wherever he might be, if he had any. He would be carrying it in his pocket. . . . I generally went to his room. I don't know how many times I went to his room, but it was two, three, four, or five times. I got it in pint bottles. I gave him a dollar for it. I said 1 got it from him four or five times altogether." On cross-examination he swore: "The space of time covered by the first time I got whisky from him and the last was something like four or five months. I got some of it in 1916 and some of it in 1917."

Mr. D. F. Meredith, the sheriff of Gregg County, testified that he examined the records of the internal revenue collector at Austin with reference to the licenses for selling intoxicating liquors in said county and that he took an exact copy of the license to White & Foster, the firm composed of J. D. White, the defendant, and J. M. Foster, the license to extend from September 1, 1916, for a year. This examined verbatim copy of the license was proven up and introduced in evidence. Appellant himself swore on his direct examination that he took out the said revenue license for himself and Foster in September, 1916. He also swore that he was prosecuted in the County Court of Gregg County for making a sale of whisky to said D'Orsay on January 24, 1917, that he plead guilty and was fined twenty-five dollars and confined in the county jail for twenty days. In addition, the State introduced in evidence the information charging him with the commission of said offense of making said sale to D'Orsay, and that he plead guilty, his punishment was assessed as stated, and that he paid the fine and costs and served the term of twenty days in jail.

There is more or less testimony by other witnesses tending rather strongly to corroborate the said witness as to the respective sales made by appellant to them.

Appellant denied making any of said sales and swore he did not engage in said business or occupation.

The evidence was unquestionably sufficient to show appellant's guilt and sustain the verdict of the jury.

He objected to the introduction of said examined copy of the internal revenue license. This examined copy was proven up completely and was clearly admissible as has uniformly been held by this court. Lucio v. State, 35 Texas Crim. Rep., 320, 33 S. W. Rep., 358; Gersteman v. State, 35 Texas Crim. Rep., 318, 33 S. W. Rep., 357; Gerstenkorn v. State, 38 Texas Crim. Rep., 321, 44 S. W. Rep., 501; Gerstenkorn v. State, 38 Texas Crim. Rep., 621, 44 S. W. Rep., 503; Thurman v. State, 45 Texas Crim. Rep., 569, 78 S. W. Rep., 937; Maddox v. State, 42 Texas Crim. Rep., 509, 55 S. W. Rep., 832; Terry v. State, 46 Texas Crim. Rep., 75, 79 S. W. Rep., 319; Biddy v. State, 52 Texas Crim. Rep., 412; 107 S. W. Rep., 814; Novy v. State, 62 Texas Crim. Rep., 492, 138 S. W. Rep., 141; Broadnax v. State, 68 Texas Crim. Rep., 177, 150 S. W. Rep., 1169; King v. State, 53 Texas Crim. Rep., 103, 109 S. W. Rep., 182.

Appellant made a motion for a continuance on account of the absence of John O. Douglass, who lived in Henderson in Rusk County, and Dan Griffin and Irwin Gray, who lived at Longview in Gregg County, where this case was tried.. The application alleged that he expected to prove by Douglass that he knew the witness D'Orsay, and his general reputation in Rusk County for truth and veracity and that it was not good. By Gray he alleged he expected to prove that said D'Orsay and Albert Hamby, another State's witness, were frequently about his cafe at night for something like a month and that nearly every night they would come in his place with lewd women and drunk; that by Griffin he expected to prove that said D'Orsay had one time sold him, Griffin, a pint of whisky. The alleged testimony by Griffin and Gray would have been inadmissible; that of Douglass could have been used for impeachment purposes alone. Hence, the overruling of the application for continuance shows no reversible error. Trinkle v. State, 59 Texas Crim. Rep., 259; Gee v. State, 57 Texas Crim. Rep., 151; Powell v. State, 49 Texas Crim. Rep., 474; Garrett v. State, 37 Texas Crim. Rep., 198; Rogers v. State, 36 Texas Crim. Rep., 563; Butts v. State, 35 Texas Crim. Rep., 364; Franklin v. State, 34 Texas Crim. Rep., 203; Bolton v. State, 43 S. W. Rep., 1010; 2 Vernon's Crim. Stats., p. 317, note 25. Moreover, appellant's motion for new trial was not acted upon by the court for nearly two weeks after the trial and no affidavit of either of these witnesses was procured, showing they would have testified as alleged. The diligence to procure the attendance of said Griffin and Gray was insufficient.

Appellant has a bill to what he claims was said by the prosecuting attorney in argument, to the effect: "We find that the defendant was around Longview Junction,. a place where whisky was sold in every nook and corner, and which is .the bootlegging territory of Gregg County." He objected to this argument, but he did not ask any charge. The court qualified the bill by stating· "That the evidence in this case

showed that bootlegging was prevalent in the Junction territory and the district attorney's argument was not in the exact language quoted, but was based on the facts as shown." The record unquestionably shows that bootlegging, as the unlawful sale of intoxicating liquors is commonly denominated, was prevalent in the territory mentioned and the argument complained of, as stated by the court, was clearly based on the facts as shown in the record.

Appellant has bills which show he complained of the admission of the testimony of each of the witnesses, Rosson, Bailes, Morgan, Northcut, Cunyus and Mayfield, wherein the court permitted each one of them to testify in substance that they knew the general reputation of appellant in the community in which he lived as that he was a man that deals in and sells intoxicating liquors. Appellant's objection was that it was an attack on his general reputation and that he had not put that in issue. The court qualified each of these bills by stating in substance that appellant had plead for a suspended sentence and that he admitted that testimony because thereof and at the time, in each instance, instructed the jury that such testimony could be considered by them only on the issue of a suspended sentence.

This testimony was clearly admissible as expressly enacted by the Legislature, article 865c, 2 Vernon's Crim. Stats., and as held by the uniform and many decisions of this court. Williamson v. State, 74 Texas Crim. Rep., 289; Conaster v. State, 75 Texas Crim. Rep., 91, 170 S. W. Rep., 314; Martoni v. State, 74 Texas Crim. Rep., 93; Backus v. State, 77 Texas Crim. Rep., 653, 179 S. W. Rep., 1166; v. State, 185 S. W. Rep., 567; Holland v. State, 79 Texas Crim. Rep., 529, 187 S. W. Rep., 944; House v. State, 80 Texas Crim. Rep., 291, 189 S. W. Rep., 468. Besides the testimony of Judge McHaney fully to the same effect was admitted without any objection by appellant. Wagner v. State, 53 Texas Crim. Rep., 306; Tinker v. State, 77 Texas Crim. Rep., 509, and many other cases.

Judge McHaney testified that he was then county attorney of Gregg County and had been for six years, and that before then he had been county judge of said county for eight years; that upon consultation with the sheriff they had determined that it was necessary that they had to procure a detective, doubtless, to ferret out and run down persons who were selling intoxicating liquors illegally; that they thereupon employed said D'Orsay, who did not live in Gregg County; that he first met him on December 8, 1916; that subsequently he made inquiry from the officials of Rusk, Cherokee, Hunt, Smith and Kaufman Counties as to his general reputation; that these inquiries were made in the places where D'Orsay had lived and among the people with whom he had associated and from these inquiries made by him and reports received by him he swore: "I think I can state what his general reputation was in his community as to truth and veracity. It was entirely good as far as I could get any report from the officials" of said counties. That they told him he was all right with the better class of people, but did not stand well with

the bootleggers. Appellant objected to this testimony on the ground that the witness had not qualified himself to testify as to the general reputation of said D'Orsay for truth and veracity and that his general reputation in that respect had not been attacked, and that the testimony was hearsay. In approving this bill the court stated that "in order for this court to fully understand this testimony it would be necessary to read the cross-examination of the witness D'Orsay; that the defendant attacked this witness very severely in his cross-examination; that D'Orsay was a stranger in Gregg County, being there only in the capacity of a detective." The cross-examination of this witness shows that he was assailed by many questions attacking his credibility and tending to bring him in disrepute before the jury; and in addition, appellant by several witnesses attacked his credibility and in effect attempted to impeach him by showing he made statements which he denied making, and they swore to such a state of fact, if believed, as to bring him in disrepute before the jury. Under such circumstances this testimony by Judge McHaney was clearly admissible. Phillips v. State, 19 Texas Crim. App., 164; Crook v. State, 27 Texas Crim. App., 241; Harris v. State, 49 Texas Crim. Rep., 339; Goode v. State, 57 Texas Crim. Rep., 220, and other cases.

The court gave a complete and apt charge such as has many times been approved by this court. There was no testimony which made it proper for the judge to tell the jury that a few sporadic sales were not sufficient to constitute pursuing the occupation or business of selling intoxicating liquor.

The record shows appellant requested several special charges, but there is nothing in them or the record that shows they were presented to the judge at the proper time as required by the statute. Neither is there any exception by him to the refusal of the court to give his special charges, or any of them. Apparently he acquiesced in the court's refusal to give them. But whether he did or not, none of them are presented in such a way as to call for a review of any of them. Even if there was, none of them should have been given.

The only other question is that the court erred in overruling his motion for new trial on the ground of the claimed misconduct of J. V. Harrison, a deputy sheriff who was in charge of the jury, and in connection therewith the claimed misconduct of the jury about the same matter. The alleged misconduct of the deputy sheriff was in substance that he "talked with the jury about the case, saying, in substance, that the defendant, or defendant and some of the White boys, had been guilty of counterfeiting, or were charged with counterfeiting, and that the White boys, including the defendant, had organized a show to go over the country and give performances and charge admissions therefor for the purpose of dealing out counterfeit money in giving change." The misconduct of the jury alleged was that they "talked among themselves about the defendant, or his brothers, or both, having been charged with counterfeiting, and permitted J. V. Harrison, an officer, to talk

with them about the defendant, or his brothers, or both, having been charged with counterfeiting."

In acting on the motion for new trial on these grounds the court heard the testimony of said deputy sheriff and every one of the jurors. Appellant introduced only one of the jurors, Mr. Echols. The State introduced the other eleven and the deputy sheriff. From all this testimony the judge was authorized to find and believe, and doubtless did reach these conclusions:

1. That said deputy sheriff did not make to the jury any such statement as was alleged he made.

2. That the jurors did not discuss or talk among themselves that the defendant had been charged with counterfeiting, etc.

3. That what was said by the jurors and deputy sheriff about the "White boys" counterfeiting, or passing counterfeit money, did not include, but excluded, appellant.

4. That whatever was said by some of the jurors and deputy sheriff, even if it included appellant, had no influence on the jury, and none of them acted thereon, in finding their verdict.

5. And that under all the facts the judge correctly overruled appellant's motion for a new trial.

Mr. Harrison was the deputy sheriff in charge of the jury. The evidence had been concluded the evening before, but no argument had been heard. The officer and jury were in the courtroom in the morning just before the court convened. No one was present. All that was said by the officer or jurymen was at this time. The substance of the testimony of each will be given, avoiding unnecessary repetition:

The officer, J. V. Harrison, swore: "Someone asked me if I knew whether the defendant was the party that was indicted here for counterfeiting money or not, and I told them he was not. He then asked me which one it was and I said that there was a report of some kind to that effect, but not about him. I don't know now who it was that asked the question, but it was someone sitting back in the jury box. There was no other reference made to the matter by me. I heard a few more words passed in regard to it, but did not pay any attention to it, not enough to tell it like it was. I recall that F. L. Birdsong was talking about an experience he had long years ago at London, in Rusk County. He said that several years ago, in 1896, I believe it was, there was a man came to his place of business where he was running a picture gallery, and tried to hire to him to work, in order that he could pass out some counterfeit money, and my recollection is that he said his name was White, but that he did not look like the defendant, or that he looked much younger than the defendant. Someone, Mr. Cunningham, perhaps, said that was ten years after the occurrence of the White boys being charged with counterfeiting. I spoke to someone and told him that it was not this defendant. That is all that I recall that happened with reference to this counterfeiting business." Cross-examined, he swore: "I heard F. L. Birdsong say that when he was running a pic-

ture gallery a good many years ago a man named White wanted to hire to him to pass off some counterfeit money. He said that the man looked younger than the defendant. He said he did not think it was the defendant, that he looked so much younger than he."

Juror Fite swore: "Mr. Birdsong was telling a little joke about a fellow trying to pass some counterfeit money off on him, or something like that, when he was running a picture gallery a good many years ago. There was nothing said about this defendant in that conversation. We were all telling jokes, but Mr. Birdsong was the man telling the joke then. I was sitting on the front row of seats of the jury box and the other jurors were all around in the jury box. I did not hear the matter of counterfeiting money, or counterfeit money, mentioned any more during the entire deliberation." Cross-examined, he swore: "I may have heard the White boys mentioned in that conversation. I don't remember whether I did or not, because all of the talks was jokes. I did not know anything about the White boys. I don't know that I thought about the White boys. I don't think I heard anything said about the White boys."

Juror Evers swore: "I do not remember anything about this conversation. I must have been sitting on the second or third row of seats in the jury box. If any conversation occurred with reference to any counterfeiting I did not hear it or did not take any notice of it." Cross-examined, he swore: "Some of the different jurors were talking with other jurors about other things. I did not hear anything said about the White boys that morning. It could have been said and I not hear it."

Juror Burton swore: "I heard the conversation about counterfeiting, but I do not remember who it was talking. I heard a conversation going on about some counterfeit money. I did not hear any questions asked with reference to it. I did not see any one manifest any interest in the conversation. . Some of the jury were talking and some were reading." Cross-examined, he swore: "I just heard a conversation that they had been counterfeiting money. I didn't hear anything said with reference to organizing a show. I thought they were talking about the White boys, and I understood in talking about the White boys they were talking about the defendant and his family. The matter was not mentioned any more after that morning."

Juror Blalock swore: "I do not remember any conversation having taken place on the morning of the. argument about counterfeiting. I think I was in a way of joking, passing off the time, talking to some one, and the conversation could have occurred and I not hear it."

Juror Doby swore: "I do not remember any conversation taking place about counterfeiting. Something like ten or fifteen minutes before the court opened the jury were all up in the jury box. Some person and I were sitting on the far seats, and we were talking, and if any conversation occurred about counterfeiting I did not hear it. I was

possibly talking to someone else about something else and did not hear it. It could have occurred and I not hear it."

Juror Halsey swore: "I remember some kind of conversation in which the matter of counterfeiting was mentioned. I do not know who was talking. We were all talking about one thing and another, and I remember that some of the folks here in the box were talking about some counterfeiting. I do not know that they ever referred to the defendant at all. That is all I heard of it. I did not hear the matter discussed after that." Cross-examined, he swore: "I don't remember who they were talking about. I just heard of the conversation while I was either talking or reading. I did not hear the name of the White boys mentioned. I heard something about a show being organized to go over the country to distribute the counterfeit money. I had never heard before that Jeff White or any of his brothers had been charged with passing counterfeit money."

Juror Moore swore: "I never heard this matter of the White boys being charged with counterfeiting mentioned. I was sitting on one of the end seats of the jury box, and presume I was talking to somebody, but I do not remember who; I might have been reading or engaged in conversation with some juror about something else. This matter could have been mentioned and I not hear it."

Juror Harris swore: "I remember about this conversation. I heard that the White boys had some connection with counterfeiting, but did not hear what White boys. Nobody called any names. I do not remember who it was talking unless Mr. Harrison, I thought, said something about passing counterfeit money off in Harrison County, somebody wanting him to help him pass it off. That is the way I thought it started. Mr. Harrison was talking about somebody passing counterfeit money, and afterwards this matter came up about the White boys. That is my understanding and recollection of it. I was sitting in the jury box upon one of the back seats. I did not hear any further discussion or reference to the matter I did not recall anything that was said in connection with it." Cross-examined, he swore: "In reference to the White boys I understood it meant the defendant and his brothers. It was something to the effect that the White boys had counterfeited money and got up a show to go over the country to dispose of the money in change. I had never heard of it before."

Juror Bagwell swore: "I was sitting on the first row of seats in the jury box, and Mr. Harrison, the deputy sheriff, was sitting three or four feet from me, about the witness stand. As well as I remember, Mr. J. L. Birdsong was telling of some little experience he had several years ago when he was running a picture gallery in London, in Rusk County. He said that a man came to him and wanted to work for him so that he could pass out counterfeit money in making change. As soon as he told this experience Mr. Harrison remarked that the White boys had been accused, convicted or something like that, of passing counterfeit money. There was something said about the show, but I

do not recall what was said. The conversation stopped at about that point. I do not know that Mr. Harrison called any name, but he just mentioned the White boys. The jury was scattered up there in the jury box, talking to one another, and Mr. Cunningham and Mr. Birdsong and I were sitting about the first row of seats of the jury box, with Mr. Harrison, the deputy sheriff, right in front of us. I remember Mr. Cunningham saying something to the effect that he had heard about that." Cross-examined, he swore: "I did not hear any question asked directly about the White boys being charged with either counterfeiting or passing counterfeit money; Mr. Harrison said something about it, but I do not remember exactly what he said. Something was said about a show and that they intended to work this money off in making change. My understanding of what was said was that Mr. Harrison said something about the White boys either having counterfeit money or having been charged with passing counterfeit money, and that there was a show organized by the White boys for the purpose of going about the country and giving it off in change. I had never heard of that before. In speaking of the White boys I understood that the statement included the demendant, but I did not know how many of the White boys there were. The matter of the White boys being charged with counterfeiting did not come up before Mr. Birdsong told his experience. The telling of his experience started the conversation. After he got through Mr. Harrison made the remark." On redirect examination, he swore: "The jury did not generally manifest an interest in the conversation. I do not know of any question being asked about it. The matter was not referred to any more in our deliberations."

Juror Birdsong swore: "I heard someone, I will not be positive who it was, make the remark that the White boys, I didn't distinguish what White boys, counterfeited some money. I did not charge my mind with it, not anticipating that anything would come of it. I never gave it but very little thought. We were all passing the time cracking jokes one way or the other, and I did not give it any special attention. If anyone asked any question I do not remember hearing it. I do not know that any member of the jury manifested any interest in the conversation. I will not be positive who it was talking, but Mr. Harrison, the deputy sheriff, and some of the members of the jury, is my recollection, but I will not be positive who they were. I never heard the matter referred to any more during the entire day of our deliberation on the case. That conversation had no weight whatever with the verdict I returned. There was no dissension in the jury room with reference to the guilt or innocence of the defendant, on the first ballot the entire jury voted that he was guilty." On cross-examination, he swore: "The matter of the White boys counterfeiting money was mentioned by someone, and in a voice that I heard. There could have been some of jurors that did not hear it. I would suppose that they could all hear it if they had been listening. It was either Mr. Harrison or the jury talking out it.   :   .   .   .   I had never heard of Jeff White being accused

of counterfeiting before. I suppose that in discussing about the White boys I understood it to mean the defendant and his brothers."

Juror Cunningham swore: "Someone said something about the counterfeiting, and I believe I said something and someone else spoke something about it. A few words were spoken, and I don't remember who it was that started the conversation. I believe one juror, I don't know who it was, asked, something about further information, but I was not clear on that. I don't know who he asked. They were talking about the White boys in the conversation, but did not say what White boys. All I remember saying is that I had heard of it, but that I didn't know anything about it. I had heard of the incident. It is a matter that occurred a long time ago. I did not hear the matter mentioned in the jury room, nor in any of our deliberations. . . ." Cross-examined, he swore: "The matter of counterfeiting and the White boys was referred to by somebody. My memory is that after the conversation started someone of the jury, whom I do not now recall, asked about what it was and made some question about it, but I don't remember who that was. I think, perhaps, all of them heard what was said. . . . In speaking of the White boys I understood that the defendant was in it, that he was one of the White boys, but I did not know anything about the trial of the case. In talking about the matter I knew that the term 'White boys,' included the defendant and his brothers."

Juror Echols swore: "I have heard the grounds of the motion with reference to statements being made about the White boys being charged with counterfeiting. There was something said about them in the presence of the jury. . . . All of the jurors were present and in or about the jury box. . . . I was sitting where the stenographer sits, about three or four feet from the jury box, and I heard someone, whom I think was Mr. J. V. Harrison, and Mr. Cunningham, one of the jurors, talking. I understand is that Mr. Cunningham or Mr. Harrison, or both of them, had said that the White boys had a show, and that they had counterfeit money, and that they got rid of the money in that way, by giving it out as change. I could not give verbatim exactly what they said, but this was the effect of it. I was astonished at it myself, and did not think it was a proper thing to talk about it, especially for an officer to be concerned in talking about it, and I remarked that we had better ask the judge whether that was proper testimony before the jury or not, and about the time I made that statement the judge of the court walked in at the door. When I made the statement somebody asked how he would know it, and I answered that I supposed he ought to know, or words to that effect. I know that Mr. Cunningham and Mr. Harrison were in the conversation about it, and that was the general trend of the conversation, but I could not say what all they said. I was reading the morning Shreveport Times when I was attracted to this conversation. I thought it was very improper." Cross-examined, he swore: "I think they desisted when I called their atten-

tion to it. I did not hear any more said about it. The matter was not further discussed in my presence. It was not mentioned when we were out in the jury room deliberating. I could not say what White boys I heard Cunningham and Harrison talking about. I do not know that they particularized what White boys. Their conversation did not affect me in arriving at my verdict. I had heard of the charge of counterfeiting against the White boys before. If I heard Mr. Birdsong, a juror, say anything with reference to the charge of counterfeiting in that conversation, I do not remember it. I only charged my memory with the fact that the thing had been talked about. I do not remember any juror except Mr. Cunningham talking about it. I thought it was an improper thing and said so. . . . When the jury retired to consider of their verdict there was but one ballot given on the question of guilty or not guilty, and all voted guilty. The only argument the jury had was on the question of whether or not they would suspend the sentence. I do not remember that I made a statement in the jury room to the effect that the defendant would get a new trial, but I think I made the statement here in the jury box, before the jury went out that the conversation referred to would likely affect the case and that we had better ask the judge about it. The defendant was not especially referred to in the conversation, except as being one of the White boys. The statement was that the White boys had that manner of getting rid of the counterfeit money, by going around with a show and giving it out in change. All of the jurors were sitting nearby and I supposed that they heard it." On redirect examination, he swore: "I understood that the conversation was about the White boys having been charged with counterfeiting money and that they were using a show as a means of disposing of it. I understood that the defendant was included in the mention of the White boys. I understood that they had reference to Jeff White, the defendant, and his brothers. I knew when I was taken on the jury that the White boys had been charged with counterfeiting, but never knew anything about whether they were tried or convicted or what the outcome of it was. I knew of the incident. I have had the general understanding that the defendant was acquitted of the charge."

Mr. Echols was the juror who made the affidavit attached to appellant's motion. The affidavit is: "That he heard J. V. Harrison saying something to one of the jurors about the White boys, and he understood that he was talking about the White boys at one time being charged with counterfeiting money, or handling counterfeit money, and that said J. V. Harrison, or the juror, or both, stated that the White boys got up a show to go over the country so they could distribute the money. Affiant says he then asked if that was proper evidence to come before the jury, and suggested that they ask the court whether or not it was proper evidence, and someone said that the court would not know anything about it."

The judge heard all these witnesses testify and saw them when they testified and on a question of fact of this kind he was the judge of the

credibility and the weight to be given to the testimony.   He could tell what was the true state of facts in the matter from all this testimony better than this court or the judges thereof can tell.   It has all the time been held in such questions that his finding on such dispute or controverted testimony will not be disturbed on appeal.   Lamb v. State, 75 Texas Crim. Rep., 80; Watson v. State, 199 S. W. Rep., 1113; Blunt v. State, 58 Texas Crim. Rep., 511; Williams v. State, 58 Texas Crim. Rep., 284; Douglass v. State, 58 Texas Crim. Rep., 127; Benevidas v. State, 57 Texas Crim. Rep., 170; Fox v. State, 53 Texas Crim. Rep., 155; Vcas v. State, 55 Texas Crim. Rep., 126, and a great many other cases.

The judgment is affirmed.

*Affirmed.*

[This case reached Reporter December, 1917.]